Samuel R. BEARD, Appellant,

v.

UNITED STATES of America, Appellee.

No. 6902.

United States Court of Appeals Fourth Circuit.

Argued March 9, 1955.

Decided April 15, 1955.

Thomas J. Kenney, Baltimore, Md., and Michael Gould, Washington, D. C. (Joseph O. Kaiser, Baltimore, Md., on the brief), for appellant.

George Cochran Doub, U. S. Atty., and Walter E. Black, Jr., Asst. U. S. Atty., Baltimore, Md., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

After a lengthy trial in the District Court, Samuel R. Beard was convicted of violating Title 26 § 145(b) of the Internal Revenue Code, 26 U.S.C.A., under an indictment which charged that he wilfully and knowingly attempted to defeat and evade a large part of the federal income tax due by him for the year 1944 by filing a false and fraudulent return wherein he stated that his net income for the year was $16,751.76 and the tax thereon $5,555.88, whereas he knew that his net income was actually $542,216.27 and the tax thereon $483,563.30. At the same time he was acquitted of similar charges in another indictment with respect to the years 1946 and 1947. Prosecution of similar charges as to 1945 was held to be barred by limitations. 118 F. Supp. 297. He was sentenced to serve a term of five years in prison and to pay a fine of $10,000. He appeals to this court on the grounds (1) that the trial court erred in admitting certain testimony; (2) that if this evidence had been excluded, the proof was legally insufficient to sustain the verdict of guilty; (3) that erroneous instructions were given to the jury, and (4) that the United States Attorney exceeded the proper bounds of advocacy in his closing argument to the detriment of the defendant.

The Government undertook to compute the taxable income of the defendant first by showing his receipts and disbursements and second by showing his net worth in each of the years covered by the indictments. The evidence offered by the Government tending to sustain the charge with reference to the year 1944 may be summarized as follows: Beard was a resident of Washington, D. C. On March 15, 1945 he filed a joint income tax return with his wife for the year 1944 with the Collector of Internal

Revenue in Baltimore. This return disclosed a gross income of $17,337.07 consisting of $5,005.43 in dividends and interest, $3,754.30 in rents and $8,577.34 from the business of the Lincoln Athletic Club in which Beard was a partner; and it showed a net income of $16,751.56 on which a tax of $5,555.58 was paid. The return was based on records maintained on behalf of the taxpayer relating to legitimate transactions on his part, and it is conceded by the Government that these records were substantially correct and that the taxpayer correctly reported his income from these sources.

The tax return for 1944 contained no information as to income from any other business under the caption "profit or loss from business or profession." In other words the return disclosed no income from any source other than those above mentioned. It was shown, however, by extensive undisputed testimony that during the year 1944 and subsequent years Beard conducted a gambling business on a vast scale as a bookmaker, dealing directly with the betting public, and also as a "lay-off" man for other bookmakers who placed "hedging" bets with him. For this purpose he maintained establishments at 307 9th Street, N. W., Washington, D. C., and 3701 Bladensburg Road, Colmar Manor, Maryland, and another at 3603 38th Street, Colmar Manor, Maryland, which he used in case of interference by the police. The Bladensburg Road location was equipped with a battery of telephones and Western Union ticker service for prompt racing returns and other purposes of the business.

The revenue agents who investigated the case repeatedly requested Beard to produce the records of his gambling operations. At first he agreed to do so but later, on the advice of counsel, he refused to furnish them while the criminal aspect of the charges was pending. Nevertheless the Government agents were able to show that Beard deposited large sums of money in joint bank accounts in the name of himself and his wife in the Bank of Commerce and Savings in Washington, D. C. Therein he separately mantained an investment account, a commercial account and two savings accounts, as well as two safe deposit boxes. The deposits in the investment account in 1944 amounted to $26,308.54 and the deposits and withdrawals in this account were consistent with the figures on his tax return. The deposits in 1944 in the commercial account amounted to $203,225.44 consisting of $44,149.44 in checks, $150,773.45 in currency and $8,302.55 in coin. The deposits in this account, 85 in number in 1944, were made continuously throughout the year. The total deposits were more than ten times the gross income reported in his tax return for this year.[1] The Government agents were unable to identify withdrawals from this account since they did not have access to the returned checks of the defendant. In addition to the deposits in the investment account and the commercial account, $15,377.70 were deposited in Beard's savings account and $3,231.75 in his wife's savings account.

Strong light was thrown on the source of the deposits in Beard's commercial account by an investigation of the amount of the out-of-town checks and money orders received by him which he deposited or cashed at the Bank of Commerce and Savings. This bank cleared through the Lincoln National Bank in Washington. The microfilm records of the latter bank for the years 1944 to 1947, representing hundreds of thousands of items, were meticulously examined by the Government agents, and the items originating with Beard were tabulated. The examination showed that during 1944 Beard received 854 checks and money orders drawn on out-of-state banks, and 1746 such items during the four year period. They were drawn on 250 different banks in 150 cities in 36 states, including New Hampshire, New York, Pennsylvania, Florida, Louisiana, Texas,

1. In 1945 deposits in this account exceeded $62,000; in 1946, $153,000; and in 1947, $102,000, in each case far in excess of his reported income for the year.

Illinois, Ohio, Montana, Nebraska, Nevada and California. The money orders were drawn in 19 cities located in 12 states. The last endorser on all of these checks was the defendant Beard. The agents prepared a tabulation of each one of the items showing the name of the bank, the drawer, the payee and the amount; and the tabulations were submitted to the defendant's attorneys two years before the trial. The Beard items on the microfilm were photographed and were made available to the defendant's attorneys long before the trial. The microfilms were retained in the bank but they were produced in court at the time of the trial.

All of the checks and money orders were either deposited or cashed at the National Bank of Commerce. They amounted in 1944 to $717,384.50, in 1945 to $169,849.80, in 1946 to $217,610.83 and in 1947 to $109,504.71.

In addition to the large number of out-of-town checks and money orders cashed or deposited at the Bank of Commerce, it was shown that Beard handled large sums of cash and local checks during 1944 and subsequent years. It was his custom to bring or send to the Bank of Commerce two or three days each week checks, currency and coins, the latter in a canvas bag, and to exchange the proceeds for $100 bills or other bills of large denomination. The sum total of these transactions for the entire year 1944 was not shown because no record of such items was kept by the Bank until June 15, 1945 when records were set up under Treasury Regulations with respect to abnormal currency transactions. These transactions amounted to $443,-593.69 for the period from June 15 to December 31, 1945, $925,379.84 for the year 1946, and $408,611.35 for the year 1947, or a total of $1,777,584.88 for the two and a half year period.

A summary taken from the records of the Bank of Commerce and Savings shows that during the year 1944 Beard received the sum of $975,238.81, which included deposits in the investment account, $26,308.54, commercial account $203,225.44, savings account $15,377.70, Building Association $50.35, Mrs. Beard's savings account $3,235.98, out-of-town clearances $717,384.50, local checks $9,656.30. This total does not include the currency transactions in this year, of which there are no records, in which Beard exchanged checks and currency for bills of large denomination.

It was obvious to the Government agents that the sums of money which passed through the defendant's hands in 1944 did not fairly represent his net income; and therefore they undertook an exhaustive search to ascertain what deductions should be made for possible duplications, business expenses and amounts not attributable to the defendant's gambling operations. For this purpose the agents took the following steps: after first obtaining his known expenses from the records of Frank Owings, an investment counsellor of the defendant, the agents analyzed and investigated Beard's investments and out-of-town clearances to determine what, if any, duplication there might be between the two, and further to find, as well as they could without access to Beard's gambling records and books, what portion of the funds which passed through his hands constituted taxable income.

Having found for the four years a total of 1746 out-of-town clearance items on the microfilm of the Lincoln National Bank, upon which Beard was the last endorser, the Government agents attempted to locate all the drawers, endorsers and remitters thereof and was successful as to 1200 of them, some of whom appeared on more than one item and for large amounts. By virtue of this search out-of-town items in the sum of $247,100.07 were eliminated from the total for the year 1944 because the remitters claimed that the checks were cashed by Beard for their accommodation, and the agents accepted their statements.

The agents also strove to eliminate duplications. It was the custom at the Bank of Commerce and Savings for the teller to place a stamp on checks which

were cashed but not on checks which were deposited. Guided by this circumstance the Government eliminated the deposits from the total of out-of-town clearances since it was obvious that they had already been included as deposits in one of Beard's accounts at the bank. In addition, in order to eliminate possible duplications, a comparison was made of the dates of all the checks which had been cashed with the dates of currency deposits. Where, in any instance, the two coincided, it was assumed that the proceeds of the check had been deposited and the amount of the check was deducted to the extent it was represented by a deposit on the same day. Additional deductions were made for business expenses and gambling losses when they could be ascertained.

As the result of the information revealed by their searches, the agents made the following deductions: (1) deposits in the defendant's investment account in the bank comprising the sum of $16,436.34 which represented monies received by Beard in payment of loans by him, and $4775 from the proceeds of bonds sold during the year; (2) a deposit of $532 in the bank account of the defendant's wife; (3) out-of-town items in the amount of $26,809 deposited in Beard's commercial account; (4) $32,936.09 representing a possible duplication of the amount of out-of-town checks cashed by the defendant and money deposited in the defendant's commercial account; (5) the sum of $3123.41 in out-of-town items found to be a payment of loans made by Beard; (6) the sum of $247,100.07 of out-of-town items which, according to statements made by the drawers to the agent, represented checks cashed by Beard for their accommodation; (7) deductions for business expenses for wire service rental, bad checks and gambling losses in the sum of $35,279.05. The aggregate of these items reduced the amount of the income chargeable to Beard to the sum of $608,246.75.

This amount was further reduced as the result of developments during the trial. The Government produced a number of witnesses who had given out-of-town checks in varying amounts to Beard in payment of gambling losses. On cross examination some of these witnesses testified that on occasion they had won bets with Beard and they identified certain of his checks in payment, which his attorneys produced. These items were accordingly deducted and together with other corrections, reduced the unreported income of Beard in 1944 to the sum of $517,383.89. From this amount an exemption of $1,000 was deducted and after making allowance for the sum of $5555.88 previously paid by Beard as the tax of the year, a deficiency of $454,664.98 was ascertained.

### Net Worth Method.

The Government, however, in proving its case did not rely entirely upon the calculation which showed the monies passing through Beard's hands in the course of his gambling business, and the deductions and eliminations therefrom which the revenue agents were able to find. There was also an earnest effort to ascertain the financial status and taxable income of the defendant by comparing his net worth at the beginning and at the end of each of the years covered by the indictments. The computation was made by Samuel W. Ford, a revenue agent of the Treasury Department with twenty years' experience, and E. Russell Kennedy, a special agent of the Internal Revenue service for 27 years. In making their investigations the agents checked the land records of the District of Columbia and the nearby counties in Maryland and Virginia, visited over 80 banks and checked motor vehicle registries and automobile dealers' records. They also examined the records of the investment counsellor of Beard, and made contact with numerous persons who had had transactions with the defendant. The purpose was to ascertain the defendant's assets consisting of real estate, stocks, bonds, bank accounts, currency, &c., and also his liabilities such as mortgage liens, obligations to banks and brokers, personal loans and debts.

The computation as to 1944, except as to depreciation, was based on evidence taken at the trial. It showed assets at the end of 1943 of $289,754.57, consisting of cash in bank, loans receivable, war savings bonds, automobiles, real estate, furniture and fixtures in a hotel and a partnership interest in a barber shop; and liabilities of $45,260.77 consisting of deeds of trust or mortgages on real estate and depreciation on buildings, furniture and fixtures, or a net worth of $244,493.80. The corresponding figures at the end of 1944 showed assets of $365,543.36 and liabilities of $43,485.91, or a net worth of $325,057.45. Thus the increase in net worth during the year was $80,563.65, to which was added income taxes of $9,241.21 paid during the year, making a total increase in net worth in the sum of $89,804.86 for the year 1944. The money spent for living expenses during the year, usually added in a net worth statement, was not taken into consideration since the figures were not available. The computation also showed a progressive increase in net worth for the succeeding years, that is, $58,723.42 in 1945, $61,355.17 in 1946 and $132,188.50 in 1947.

The sources from which the figures were taken were explained. The assets were ascertained from the ledgers and records of the bank, an investment counsellor of the defendant, borrowers from the defendant, the contents of a safe deposit box shown to the agents by the defendant, the land records and the records of automobile dealers. The liabilities were obtained from the records of the mortgagees and depreciation was calculated at a definite percentage per annum based on cost.

The position of the defendant in respect to the net worth method is that the evidence was so uncertain as to have no probative force to show tax evasion, and therefore the computation was inadmissible in evidence. It is said that the agents did not establish a starting point with reasonable certainty and in fact had no way of knowing the exact amount of the assets and liabilities of the defendant either at the beginning or end of the year. In this respect, however, the quality of the proof offered by the Government did not differ materially from that usually employed in criminal prosecutions when the Government is forced to estimate the net worth of the defendant because he has failed to keep or refuses to produce records of his business. It has been recognized in gambling cases and in other cases of tax evasion that it is impossible for the Government to prove the exact amounts of unreported income, and that to require precision in computing the profits from an elaborately concealed business would be tantamount to holding that skillful concealment is an immovable barrier to proof. See United States v. Johnson, 319 U.S. 503, 517, 518, 63 S.Ct. 1233, 87 L.Ed. 1546.

The evidence outlined above clearly shows that the Government agents did make a diligent search to ascertain the assets and liabilities of the defendant. The specific criticism of the defendant is directed to three points. (1) There was a failure to include in the assets at the beginning of the year $4775 of Home Owners Loan Corporation bonds which were sold during the year. This omission was pointed out by the agent himself in direct examination and, when taken into consideration, did not materially affect the probative force of the evidence. (2) The calculation does not make any allowance for cash on hand at the end of December 31, 1943 notwithstanding abundant evidence that the defendant was handling a large sum of money in the course of his gambling business. The amount of cash on hand, other than cash in bank, at the beginning and end of the year was not known to the agents, and therefore could not be considered; but there was nothing to show that the amount of cash on hand was greater at one end of the year than the other. The contention of the defendant in this respect therefore loses significance. The case is unlike that discussed in 'Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, and Friedberg v. United States, 348

U.S. 142, 75 S.Ct. 138, in which the taxpayer presented evidence of substantial cash on hand which was not allowed in the net worth statement of the Government. Even in those cases a conviction was sustained by reason of other aspects of the Government's proof. (3) During the cross examination of the Government agents defendant's attorneys produced checks of the defendant in the sum of $38,732.87 which were issued in December, 1944 but were outstanding and not included in the liabilities of the defendant as of the end of the year. The existence of these checks was not known to the agents until they were produced by attorneys for the defendant during the trial; but if they had been previously known it would not have been proper to have taken them into consideration, unless the amount of outstanding checks at the end of the previous year had also been known. Nothing in the evidence indicates that the amount of outstanding checks was materially different at the end of one year than at the end of the other, and if they had been taken into account only at the end of 1944, the computation would obviously have been distorted and incorrect. The untenable position of the defendant is clearly shown by his offering in evidence only the checks at the end of the year and his withholding of the amount of outstanding checks at the beginning of the year. The defendant's attorneys had access to his records and their failure to produce those which would have made possible an exact calculation on the particular point, justifies the inference that their production would not have been to the defendant's interest.

■ The evidence elicited by the two methods of proof used by the agents was in our opinion sufficient to go to the jury as tending to prove the charges in the indictment. Obviously and necessarily the computations were inexact in the accounting sense, as is shown by the striking difference between the results reached in the two calculations. It was clearly shown, however, that the agents made diligent efforts to ascertain the true facts and to run down every lead revealed by their searches and to give to the defendant the benefit of any circumstance favorable to his side of the case. It is quite likely that the expenses of the illegal business were far greater than those which the agents were able to find, but in view of the large sums of money received from all parts of the country which passed through the hands of a professional gambler of long experience over a considerable period of time, it is reasonable to conclude that the enterprise was not unprofitable.

The defendant relies on the testimony of eight Government witnesses as to their gambling transactions with him which allegedly resulted in winnings of $50,803.10 and losses of $71,682 in 1944. His attorneys state in their brief that because of this state of the proof the defendant elected not to take the stand and offered the testimony of two accountants whose testimony was confined to the criticism of the accounting methods used by the agents. The eight witnesses, however, constituted a very small proportion of the persons dealing with the defendant and the attorneys did not venture to explain why they produced from the defendant's custody only those items which tended to support the defense and withheld other items which would have shown the true nature and extent of the business.

The significance of deposits constantly made in the course of a lucrative business as indicating taxable income is pointed out in Gleckman v. United States, 8 Cir., 80 F.2d 394, 399; and the impossibility in a case of this kind of presenting exact proof of the receipts and disbursements and the permissible inferences to be drawn from the operation of an illicit business are pointed out in the following quotation from the decision of the Supreme Court in United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546, in which the conviction of tax evasion by a gambler on a

magnificent scale was sustained. The court said:

"* * * That these gambling transactions were on an enormous scale was overwhelmingly established. It is not to be expected that the actual financial transactions of such a vast illicit business would appear by direct proof. * * * The long duration of this gambling business, the substantial evidence of the operation of the law of probability in favor of the houses, such records as there were pertaining to the private banking facilities and currency exchanges which were at the service of these houses, made it not a matter of tenuous speculation but of solid proof that there were winnings of a substantial amount which Johnson did not report."

### Admissibility of Evidence.

The first objection of the defendant to the admissibility of evidence relates to the transcript of the Beard checks taken from the microfilm of the Lincoln National Bank. The evidence was offered in the following manner: Microfilm copies of the checks made by the Bank by the Recordak process in the usual course of business were brought into the courtroom in four large boxes, and having been identified, remained in the courtroom throughout the trial. They comprised 950 reels of microfilm, each containing reproductions in miniature of approximately 1500 checks. From the microfilm the Government made enlarged photographs of 854 checks cashed or deposited in 1944 at the Bank of Commerce and Savings by Beard or his wife, and bearing the signature of one or the other as last endorser. These items were listed on a 19 page document which contained as to each check the date, the bank on which it was drawn, the drawer, the payee and the amount; and it also contained figures by which it could be identified as one of the items in the microfilm. It was prepared by ten revenue agents under the supervision of agent Samuel W. Ford.

The defendant contends that it was error on the part of the court to allow the transcript of the checks to be introduced in evidence on the grounds (1) that the reels themselves were not in evidence, (2) that the enlarged photographs of the 854 checks selected should have been first produced and (3) that the 19 page transcript was not properly identified by the persons who prepared it.

It is obvious that the microfilm itself was to all intents and purposes offered in evidence since it was present in the courtroom and marked as an exhibit, and it is equally clear that it was admissible in evidence as a record kept by the bank in the due course of business under the provisions of 28 U.S.C. § 695, now 28 U.S.C.A. § 1732, which were declared to be competent evidence in the case of United States v. Manton, 2 Cir., 107 F.2d 834.

The nature of the objection that the enlarged photographs of the checks were not first produced is not clearly shown and and it does not appear that the failure of the ten agents who prepared the transcript from the microfilm to testify was in any way prejudicial to the defendant. It would of course have been impossible for the court and jury to have personally examined the million and more items contained in the microfilm, and to select those pertinent to the case. The only practical course was to permit the results of the investigation to be presented to the jury subject to the examination and verification by attorneys for the defendant. It was shown that the transcript had been furnished to the defendant three years before the trial and the photographic copies of the checks two years before, so that he had ample opportunity for inspection and comparison. The accuracy of the transcript was demonstrated by the fact that photographic copies of checks were produced from time to time during the course of the trial and in no instance was it discovered that there was any variation between them and the information contained in the transcript.

■ It is true that the agent in charge of the investigation, who appeared as a witness in the case, did not personally compare each item on the transcript with the photographic copy of the corresponding check, but the work of preparing the transcript was made under his supervision and the ten men who did the actual work were available as witnesses. It was indicated by the judge that they would be produced if the attorneys for the defendant desired to interrogate them. It is obvious that the evidence was relevant and that the defendant was in no way prejudiced by the manner in which it was produced.[2]

■ The defendant objected also to the ruling of the court admitting the testimony of three employees of a telephone company who gave a detailed description of the telephone equipment which they found at his various bookmaking establishments in March and May, 1945. The contention is that since the defendant was not on trial as to the year 1945, the evidence was inadmissible to sustain the charges contained in the indictments. The contention is hardly worth consideration since it was conceded during the trial that the defendant was engaged in gambling operations throughout the period from 1944 to 1947, inclusive. The evidence was relevant as showing the nature and extent of the operations, and even as to the year 1944 it was relevant on the question of the defendant's intent since it showed his conduct at a time not far distant from the period covered by the illegal operations for which he was indicted. Certainly it was not prejudicial to show that the defendant was in possession of facilities useful in the business in which it was admitted that he was engaged. Emmich v. United States, 6 Cir., 298 F. 5.

### Instructions of the Court.

■ Objection was made to an instruction of the trial judge that the jury in determining the issue as to whether the defendant had wilfully filed a false return might take into consideration his failure or refusal to produce his books and records for inspection when requested to do so by the Government agents charged with the duty of checking the accuracy of the returns, as provided by 26 U.S.C.A. § 3614. The instruction was in the following words:

"Also, I instruct you that the taxpayer who keeps records of books of account is required to produce them at a reasonable time for inspection by the duly authorized Government revenue agents in connection with their administrative duties in checking the correctness of the returns, and failure or refusal of the taxpayer to produce his books and records for such purpose is a circumstance which may be considered by you, the jury, in determining the issue of whether he has wilfully filed a false return.

"In this connection. I instruct you that the taxpayer may exercise his constitutional right under the Fifth Amendment to the Constitution to refuse to surrender or allow inspection of his books and records by rev-

---

2. During the trial in the District Court the defendant moved that all of the evidence of bank deposits be stricken because the bill of particulars did not specifically state that they would be considered in the course of the trial. The motion was properly overruled. The bill of particulars stated that the internal revenue agents examined the records of the Bank of Commerce and Savings in order to determine the unreported income of the defendant and found that he had control of various deposit accounts therein. The defendant excepted to the bill of particulars and asked for a complete list of all of his checks that were not deposited and was furnished with a complete list of all of the out-of-town items. Hence he was fully informed that his bank accounts would be used in the course of the trial and there was no element of surprise when his deposits were put in evidence. He was of course better acquainted with the details of his transactions with the bank than the agents who had prepared the case for trial. See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; Land v. United States, 4 Cir., 177 F.2d 346.

enue agents on the ground that to do so might tend to incriminate him in the event of criminal prosecution; and such constitutional privilege against self incrimination is not impaired by the rule that the court has just stated, that the taxpayer's failure to produce any books and records that he may have, at a reasonable time for inspection by revenue agents, is a circumstance which may be considered by you, the jury, in determining the issue of wilfully filing a false return, in a criminal proceeding such as this."

It is urged that this instruction was erroneous because the production of the taxpayer's records was not requested until April 6, 1948, more than three years after the 1944 return was made, by which time the assessment of an additional tax was barred by limitations under 26 U.S. C.A. § 275(a). It is conceded, however, that under §§ 3615 and 3633 of Title 26, the District Court has power to compel the production of records even as to barred years, if the court finds basis for a suspicion of fraud; but since the agents did not apply for an order under that statute, it is said that the defendant's refusal does not justify an inference of wrongdoing. Particularly it is urged that to permit an inference of guilt to be drawn from the failure of the defendant to produce records which might incriminate him, would violate the provision of the Fifth Amendment that no person shall be compelled in any criminal case to be a witness against himself.

We find no error in the instruction. For the purposes of this case it is immaterial that the revenue agents did not apply to the court for an order compelling the production of the records. Request was made of the defendant and refused, and the natural and proper inference to be drawn from the refusal, unless the defendant's constitutional rights are thereby infringed, is that the records disclose improper conduct on his part. A similar instruction in substantially the same form was sustained in Myres v. United States, 8 Cir., 174 F.2d 329, and in Olson v. United States, 8 Cir., 191 F.2d 985. Moreover, the instruction related to the duty imposed by the taxing statutes upon the defendant to keep records of his transactions so that the extent of his liability to income tax might be ascertained; and therefore the case falls within the rule laid down in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787, which reviewed a conviction of violating the regulations under the Emergency Price Control Act and held that it was proper for the jury, in determining the issue of the defendant's guilt, to consider the business records of the defendant produced by him under a subpoena issued by authority of the statute. It was held that all records which Congress in the exercise of its constitutional powers may require individuals to keep in the conduct of their affairs relating to the public interest become public records in the sense that they fall outside the constitutional protection of the Fifth Amendment. The court said, 335 U.S. 32–33, 68 S.Ct. 1391:

"It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. But no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator. It is not questioned here that Congress has constitutional authority to prescribe commodity prices as a war emergency measure, and that the licensing and record-keeping requirements of the Price Control Act represent a legitimate exercise of that power.

Accordingly, the principle enunciated in the Wilson case [Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771] and reaffirmed as recently as the Davis case, [Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453] is clearly applicable here: namely, that the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established' " !

The defendant also contends that it was error for the judge in the course of his charge to tell the jury that in arriving at their verdict they might consider the failure of the defendant to offer an explanation of the discrepancy between his tax returns and his income, as indicated by the Government proof. The court said:

"Members of the jury, having explained that there are several common methods, and having explained generally, in outline, the two methods that the Government has seen fit to employ here, I instruct you that under any such method, you, the jury, may find that the taxpayer has been guilty of fraud, wilfully committed for the purpose of evading the full amount of tax that he owes, if, and only if, you shall find that, beyond a reasonable doubt, there has been no evidence presented or an adequate explanation of the discrepancies.

\* \* \* \* \* \*

"It is true that the burden of proof resting upon the Government does not shift, as the Court has explained, during the progress of the case. But when, as here, in trial on charges of income tax evasion, discrepancies are indicated by the Government's proof, the failure of the defendant to offer explanation in any form may be considered by you,

the jury in arriving at your verdict. It is not incumbent upon the Government to adduce positive evidence to support a negative averment—the truth of which is fairly indicated by established circumstances—if you should find that to be true,—and which, if untrue, could be readily disproved by the production of documents or other evidence, probably within the defendant's possession or control."

This instruction was part of a charge in which the jury was repeatedly told in unmistakable language that the burden of proving the guilt of the accused as to each of the charges in the indictments rested upon the Government throughout the trial, and that the proof must be sufficient to convince the jury of the defendant's guilt beyond a reasonable doubt; and that the defendant had a constitutional right not to take the stand and that his failure to do so did not weaken the presumption of innocence which persisted throughout the trial.

We find no error in the challenged portion of the charge given in this setting. It was in accord with the decisions of this and other courts. See Bell v. United States, 4 Cir., 185 F.2d 302, 309; Jelaza v. United States, 4 Cir., 179 F.2d 202; United States v. Hornstein, 7 Cir., 176 F.2d 217; Bradford v. United States, 5 Cir., 130 F.2d 630. Even in Olender v. United States, 9 Cir., 210 F.2d 795, where such an instruction was criticized as tending to divert the attention of the jury from the duty of the prosecution to prove its case beyond a reasonable doubt, the court said (p. 808) that the challenged instruction, considered as a part of the whole charge would not in itself have required a reversal if other errors had not been committed during the course of the trial. As far back as Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904, it was held that the compulsory self-incriminating clause of the Fifth Amendment was not violated by a statute which provided that the possession of illegally imported opium should be deemed sufficient evidence of

guilt, unless the defendant should explain the possession to the satisfaction of the jury. In United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, it was held that the Fifth Amendment does not protect the recipient of illicit income from prosecution for wilful failure to make an income tax return; and in the very recent case of Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 137, it was said that "once the Government has established its case, the defendant remains quiet at his peril." This observation is especially pertinent in this case where the defendant, although availing himself of his undoubted right to remain silent nevertheless put in evidence fragmentary portions of the records of his business, admittedly in his possession, but nevertheless withheld the writings which would have given a complete picture of his gambling operations.

Finally it is contended that the United States Attorney exceeded the proper bounds of advocacy in his closing argument by appealing to the prejudices of the jury and urging them to base their determination on irrelevant factors. Specific objection is made to statements to the effect that the defendant had operated one of the biggest gambling rackets in the country for four years, that he had refused to prove the records of his business which would doubtless have shown the payment of protection money, and that if the Government were compelled to perform the impossible task of proving defendant's expenses in order to secure a conviction, not a single professional gambler in the United States would ever pay an income tax. It is argued that it was prejudicial error for the United States to bear down on the "extraneous circumstance" that the defendant was violating the gambling laws, and to assert in the absence of proof that his expenses must have consisted largely in bribing the police. We do not consider that the remarks complained of went beyond the bounds of permissible argument, or that they were prejudicial to the defendant, especially as the trial judge fairly charged the jury and directed their attention to the specific findings which they must make in order to justify a conviction. It is manifest that the jury were not diverted from their duty to consider the evidence in all its bearings, since they found the defendant guilty only as to the year 1944 and acquitted him of violating the statute with reference to the years 1946 and 1947.

The judgment of the District Court is Affirmed.