WILLIAM G. LIAS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM G. LIAS AND ALICE B. LIAS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27264, 27762.   Filed May 26, 1955.

*Charles J. Margiotti, Esq.,* and *Thurman Hill, Esq.,* for the petitioners.

*James C. Maddox, Esq.,* and *William M. Fay, Esq.,* for the respondent.

294

302

OPINION.

LeMire, *Judge:* These proceedings involve income taxes and penalties of the petitioner for the years 1942 to 1947, inclusive, and of the petitioner and his wife for the year 1948, in the aggregate amount of $2,012,222.18. The deficiencies were determined by the respondent under the net worth expenditures method, the use of which is approved by the Supreme Court in cases of the character here under scrutiny. *Holland* v. *United States*, 348 U. S. 121.

Before discussing the specific issues presented, a brief summary of the petitioner's background and activities prior to the taxable years is essential to a proper understanding of the matters hereinafter presented.

Petitioner William G. Lias has continuously engaged in illicit enterprises. Between 1923 and 1930 he was convicted of violating the National Prohibition Act on 4 occasions, for which he received 3 prison sentences ranging from 6 months to 2 years in addition to fines. Even while serving his last sentence he continued his interest in a partnership engaged in the numbers business. Dating from his release from the penitentiary in 1933, and continuing through the taxable periods in question, the petitioner has maintained varying interests in partnerships and corporations, most of which derived their income from gambling activities embracing many forms. Those enterprises in existence in the taxable years are set forth in our findings and will be referred to hereinafter only as necessity requires.

The most important question raised is the method used by the respondent to compute the taxable income of petitioner for the years involved. The petitioners challenge the respondent's use of the combined net worth of the family group, rather than the individual net worth of William G. Lias, as arbitrary and unauthorized.

During the course of the examination of petitioner's returns for the years 1942 to 1946, inclusive, the revenue agents ascertained that the investments and the expenditures were greatly in excess of the income reported. Many large transactions were carried out with the use of cash, involving listed stocks, real estate, United States bonds, bank accounts, and the income therefrom, as to which no records were kept by the petitioner.

When the agents made inquiry of petitioner as to specific assets which had been discovered, he stated repeatedly that all assets, regardless of whether they were in the names of his wife, brother, mother-in-law, or brothers-in-law, were his to do with as he saw fit. Petitioner was unable to identify the source of funds used to acquire various assets. He had no permanent books of account or records from which the agents could determine the amount of his income subject to tax.

Petitioner refused to furnish the agents with a net worth statement. In endeavoring to compare reported income with the increase in net worth, the agents were met with the difficulty of identifying the ownership of assets. Corporate dividends were not paid in accordance with stock record ownership. Bank accounts were shifted from the name of one of the group to the name of another and stocks of record were not in the names of the true owners. Assets other than cash were shifting from the nominal ownership of one of the group to another. The petitioner handled the money of the family group. Much of the property at the beginning of the taxable period 1942 to 1948, inclusive, was in the name of petitioner's wife.

During the investigation made by the revenue agents, corporate stock was transferred on December 18, 1946, to conform the record ownership with the true ownership, and in 1947 petitioner filed gift tax returns for the same purpose. With these recorded transfers the record ownership of stock conformed substantially with the income reported, plus gifts of the individual members of the group.

Confronted with this confused state of the affairs of petitioner and the members of the family group, the agents determined that it was impossible to compute the individual net worth of the petitioner without reference to the entire group and were compelled to compute the consolidated net worth of the Lias family in order to compute the individual net worth of the petitioner. The combined taxable net income of the petitioner, his wife, his brother, and brothers-in-law, was determined by taking the increase in their combined net worth during each year, adding Federal income taxes, insurance premiums, and personal expenses paid during each year, and making proper adjustments for capital gains and losses. From such combined taxable net income there was deducted the income reported or adjusted for the other members of the family group, leaving the taxable net income of the petitioner.

The petitioner argues that if the consolidated net worth of the family is resorted to, the assets of the individuals rather than the income reported or as adjusted should be deducted in determining his taxable net income. The argument so simply stated appears ingenious. When considered in the light of the above facts and circumstances we think it lacks sincerity. The petitioner so conducted his own affairs and those of the Lias Group as to make it impossible to identify the individual ownership of assets. We are not persuaded that the petitioner did not create this confused situation deliberately and with purposeful design. The fact that no members of the family group, except petitioner and Gregory Manos, were sworn as witnesses in these proceedings is not without significance. In his testimony Gregory Manos made no claim to any assets or indebtedness of petitioner to

him. The testimony of the petitioner will be discussed later in connection with other phases of the net worth computation.

It is to be further noted that after the revenue agents prepared the consolidated net worth statement as a basis for the respondent's determination, the existence of the amount of $124,000 of mutilated currency was revealed. At least a part of such funds appears rather convincingly to have been income earned in the taxable period which has not been reflected in such computation. The Government is not powerless to collect its due. A taxpayer may not be heard to complain where by his own conduct he has rendered it impossible to ascertain his taxable net income by the methods ordinarily employed. While the consolidated family net worth technique does not appear to have been resorted to heretofore, we think its use is permissible as embraced within the scope of the net worth technique in civil cases of the character under consideration and involving the complexities and unprecedented circumstances presented. In our opinion no substantial injury results to the petitioner. Extraordinary situations require the adoption of unusual methods to resolve them. Mindful of the pitfalls inherent in any net worth method, we approve the respondent's use of the consolidated net worth method in the instant proceedings. Cf. *Beard* v. *United States*, (C. A. 4, 1955) 222 F. 2d 84.

A second challenge to the net worth statement is that it discloses no cash on hand of the petitioner and other members of the family unit at the beginning of the taxable period involved. This attack is particulary commonplace where the source of income is from illicit and gambling activities. It is essential that the opening net worth be established with reasonable certainty, since the subsequent calculations are dependent on its accuracy.

The petitioner claims that on January 1, 1942, the beginning of the net worth period, he alone had between $850,000 and $950,000 cash reserves on hand. He testified that in June 1926 he had $219,000 in concealed currency, and by June 1936 it had increased to $620,000. Assuming for purposes of argument the existence of the amount of $219,000 in 1926, the total amount of net income reported by petitioner for the period 1928 to 1935, inclusive, amounted to $143,192.31, which, if added to the $219,000 cash reserve, would aggregate only $362,192.31 as of December 31, 1935. If the cash reserve of $620,000 as of June 1936 is accepted, it is obvious that the petitioner had not reported his correct taxable income in the period 1928 to 1935, inclusive.

For the period 1936 to 1941, inclusive, the petitioner reported net income of $132,866.76, which, if added to the assumed amount of $362,192.31 as of December 31, 1935, the cash reserve as of December 31, 1941, would aggregate $495,059.07. Petitioner testified that the

expenses and attorneys' fees incurred in the defense in 1935 of the criminal charge of income tax evasion were approximately $100,000. The record discloses that for the years 1934 to 1941, inclusive, petitioner paid Federal income taxes of $18,128.09. Petitioner testified that his living expenses for the period 1926 to 1941, inclusive, varied between $6,500 and $12,000 annually. Applying the minimum of $6,500, the living expenses for the 15-year period would aggregate $97,500. By December 31, 1941, the visible assets acquired totaled $164,732.97. The above-mentioned expenditures aggregated $380,-361.06. If that amount is deducted from the assumed cash reserve as of December 31, 1941, $495,059.07, it gives a resultant figure of $114,-698.01, which would be the cash reserve as of January 1, 1942, if the existence of the amount of $219,000 in currency in June 1926 is accepted as a fact. It may be also noted that the foregoing figures do not take into account the expenses and attorneys' fees incurred in the trial and appeal from the petitioner's conviction in 1930 for a violation of the National Prohibition Act, nor the large amount of illicit whiskey and equipment which the petitioner testified was confiscated about that time, the value of which is not revealed.

Despite the testimony of petitioner, the record discloses a great deal of credible evidence which negates the existence of any secreted currency as of January 1, 1942.

Upon petitioner's return from the penitentiary in September 1933, he borrowed $2,000 to take a trip to the West Coast. In 1934, a mortgage placed on his home in 1929 to raise money to start the numbers business was foreclosed. In 1937 the petitioner submitted an offer to pay $10,400, stating that it represented his true and actual tax, penalty, and interest liability for all years prior to January 1, 1934, and that the full amount would be paid by February 28, 1938. On March 2, 1938, Goldberg, who had a power of attorney from petitioner, wrote a letter to the Tax Division of the Department of Justice, enclosing a check for $1,000 and stating that petitioner regretted he could not send more, but in view of business conditions he found it impossible to do so and that to pay his entire tax would deplete petitioner's working capital. On March 22, 1938, a new compromise offer was made by petitioner which provided for certain installment payments. Petitioner defaulted on the June 1 installment payment, and on June 6, 1938, Goldberg wrote a letter stating that he had been requested to advise that petitioner was unable to send the $500 due because of recent heavy losses. On August 4, 1938, Goldberg wrote a letter stating that petitioner was unable to make any of the monthly payments because business had been and was very bad, and petitioner did not foresee any change for the near future. On November 21, 1939, Goldberg wrote a letter stating that Special Agent Hauk had been

there to obtain a settlement of the taxes for 1928 to 1933, inclusive, and that petitioner had given him 13 postdated checks. On April 29, 1940, Goldberg wrote a letter to the collector requesting postponement of the two monthly installments of $300 each because business was bad. On May 16, 1941, petitioner wrote a letter enclosing $50 to apply on income taxes for past years and stating that circumstances at the present time did not permit sending more. From 1938 through 1941 the collector for the district of West Virginia endeavored, without success, to find property of petitioner. Petitioner did not pay his unpaid tax liability until November 1942. He did not pay the fines imposed on his convictions in 1926 and 1930 for violations of the Prohibition Act until December 1946.

The record contains other evidence tending to negate the existence of any cash reserve at the beginning of the net worth period, which is not specifically detailed here because of its cumulative character.

The petitioner testified that he had no records to support the existence of any cash reserves as of January 1, 1942, or for prior years.

If the petitioner and Goldberg in their communications to the Government during the period 1937 to May 16, 1941, were stating the truth as to the petitioner's then financial circumstances, the testimony given by the petitioner in these proceedings as to his reserve of cash is false. Goldberg was rather intimately associated as an accountant with petitioner's enterprises and his finances. We are unwilling to conclude that Goldberg was a voluntary party to any deception on the part of the petitioner in the communications to the Government respecting the petitioner's ability to pay his unpaid tax liability and prefer to accept those statements as representing the truth.

The petitioner was on the stand for several days, affording the Court an opportunity to observe his demeanor as a witness. He was evasive, contradictory, and unresponsive. As a result of his many litigations arising from his disregard of law, petitioner had evidently acquired a technique of evasiveness and confusion that made him a very difficult witness. Making due allowance for the petitioner's unfortunate position the Court, after a considered appraisal, is not disposed to give any credibility to his unsupported testimony.

Furthermore, the testimony of the revenue agents shows they made checks to verify petitioner's claims of cash reserves, without avail. The agents testified that the petitioner had stated he made considerable money in prior years from bootlegging and gambling activities but his expenses and overhead were very heavy. The term "overhead" when used in connection with illicit activities has a significance other than its ordinary meaning. The petitioner testified that he did not tell the agents what cash he had on hand as of January 1, 1942,

the critical date involved. The agents were aware of petitioner's financial circumstances with respect to his unpaid tax liability, as disclosed in the aforementioned communications, and, therefore, appear to be justified in accepting petitioner's statement that the only cash on hand on January 1, 1942, was what he had in his pocket. It is an old maxim that he who deals with his Government must turn square corners. We are convinced that the petitioner has not sustained his burden with respect to the deficiencies of showing any amount of cash on hand at the beginning of the net worth period other than the bank deposit reflected in the net worth statement.

The petitioner further claims that the net worth statement is arbitrary because it fails to credit any cash on hand at the critical date belonging to the other members of the Lias family unit. A search of the record does not disclose any testimony as to cash on hand at the opening of the taxable period belonging to members of the family other than the cash reserve claimed by William G. Lias. Petitioner testified that he was the only one of the family unit who handled the money. If the other members had cash at the beginning of the taxable period they still had it at the close of the period. Outside of the petitioner, the only member of the Lias family to testify in these proceedings was Gregory Manos, who did not testify that he had any cash on hand on January 1, 1942. Although a deficiency and a fraud penalty are asserted against petitioner's wife, Alice B. Lias, for the taxable year 1948, she was not sworn as a witness, nor were William Manos, John Lias, or Mary Manos. Counsel for petitioner stated at the trial they were available to the respondent if the latter saw fit to call them. This is no valid excuse for petitioner's failure to do so.

The respondent was under no obligation to have them sworn. The inference may be drawn that, if called, their testimony would not have been favorable to petitioner's case. We think this contention of the petitioner is without substantial merit.

The petitioner further claims that the net worth computation is faulty for the reason that it does not reflect the petitioner's liability to John Lias of $118,000, which he gave the petitioner in 1931, the amount of $66,000 which his wife, Alice B. Lias, had in 1935, and the amount of $10,000 which Mary Manos brought into the family pool. While the petitioner testified that the above amounts were brought into the family pool there was no documentary proof or other substantiating evidence presented convincingly to establish such facts.

As to the claim that John Lias contributed $118,000 to the family pool in 1931, the petitioner's testimony indicates considerable uncertainty as to whether the amount was $115,000 or $118,000. The petitioner testified that he did not see the money but was told that it was given by John to petitioner's sister. There is some evidence that pe-

tioner had executed, at some undisclosed date, a note to John for the sum of $100,000. Petitioner told the agents that the $100,000 note was given for money John loaned to him to make payment on the racetrack in 1945 and that it was paid by issuing 1,000 shares of stock to John.

The revenue agents made a check of the Federal income tax returns filed by John Lias for the years prior to 1932 to ascertain his possible cash reserve in 1931. Prior to 1932, John filed tax returns for the years 1924, 1925, 1926, and 1928 only. The total income reported or adjusted for those 4 years, as stipulated, was $9,471.70. For the year 1932, John reported income of $2,600, which represented his salary of $50 per week from the numbers business, and for the year 1933 his reported or adjusted income was $3,500, representing his salary of $75 per week from the same source. In the face of such undisputed evidence, and the fact that John was not a witness in these proceedings, the petitioner's claim respecting the sum of $118,000 appears to the Court to be incredible.

As to the claim that Alice B. Lias, in 1935, contributed to the pool the sum of $66,000, it is sufficient to note that the only testimony to support it is petitioner's. The record on the contrary indicates that such funds as Alice B. Lias had were furnished to her by petitioner.

In connection with the alleged contribution of $10,000 by Mary Manos, the petitioner testified that Mary Manos had purchased the Aul & Shively and Musee Buildings for $25,000, putting in $10,000 and borrowing the balance. The mortgage placed thereon was for $10,000. Improvements of $14,438.49 were made, making the total cost $39,438.49. Revenue Agent Young testified that he was told by the petitioner that he had paid for the property and improvements and taken the deed in the name of Mary Manos. The interest on the mortgage was not deducted on the returns filed by Mary Manos. The losses from the operation of these properties of $390.11 and $853.14 for 1943 and 1944, and the income therefrom of $1,883.57 and $546.12 for 1945 and 1946, are included in the income of petitioner in the deficiency notice. Neither the rents nor the gain on disposition in the year 1946 were reported on any income tax return. In October 1947 the rental account of such buildings in the Half Dollar Trust and Savings Bank was transferred to Automatic. On May 11, 1946, the properties were transferred to Laconia, Inc., for 320 shares of its capital stock at a cost of $32,000. Laconia, Inc., paid the balance due on the mortgage of $8,099.47. Certificate No. 4, for 320 shares of Laconia stock, which was issued in the name of Mary Manos, was transferred in 1950 to trusts for the children of petitioner. Gregory Manos testified that he knew of no money or property received by his mother at his father's death. Mary Manos lived with her sons, and in the years

1937, 1939, and 1940, she was claimed as a dependent by Gregory, and for the years 1941 and 1942 by William Manos.

The foregoing recital would appear to support the agent's testimony that petitioner stated he had purchased the buildings in question and tends to discredit the petitioner's claim, at the trial, that Mary Manos contributed $10,000 to the pool.

A further claim is made that a substantial part of the distributive partnership share of Zeller's Steak House, Inc., in the net income of Market Street Club was paid to the petitioner and would increase the fund available to him in the taxable years. The record does not show that petitioner actually received any part of such amount. If Zellers, a separate taxable entity, did not draw all of its distributive share from Market Street, it, and not the petitioner, had a receivable to that extent.

The petitioner assigns as error the inclusion in the year 1946 of the amount of $10,000 as salary from Wheeling Downs Racing Association and accrued on its book in 1946, which amount the petitioner did not receive until 1947. The respondent determined the amount was constructively received in 1946 and included it in income for that year, and eliminated that amount from income for 1947. No facts are set forth in the petition respecting this assignment of error. On brief, the petitioner mentions the amount of $10,000 as salary from Automatic but makes no argument other than that the respondent reversed his position on a similar item in the case of Gregory Manos upon protest. The respondent, on brief, merely refers to the amendment to his answer in Docket No. 27762, filed May 9, 1952, wherein it is alleged that if such salary was not constructively received in 1946 the adjustment should be made to conform with whatever action is taken for 1946 on this issue. In this posture of the record, and in the absence of any facts which would enable it to make a determination, the Court is of the opinion that the respondent's determination that the sum of $10,000 was constructively received in 1946 should be sustained, since the burden to show the contrary is upon the petitioner. Furthermore, we are not persuaded that the petitioner seriously presses the point. In this connection it may be observed that the amount of unreported income of petitioner, as shown by the net worth statement for the year 1946, is only $50,040.79, as against $196,212.48 for the year 1947. To add the sum of $10,000 to the latter year would have the effect of increasing the deficiency to the detriment of petitioner, since 1947 is the higher bracket year.

Petitioner also assigns as error the disallowance of $20,710 as a deduction claimed in 1943 for gambling losses personally sustained during that year. There is no evidence to support this claim and, therefore, the petitioner has failed to meet his burden of proof.

The petitioner further argues that it was error to include in his income small amounts of interest on bank accounts, rents from certain real property, and dividends on stock standing in the names of other members of the Lias family.

It was the practice of the petitioner to place bank accounts, real estate, and stock in the names of others than the true owners. See also Findings of Fact made by District Judge Harry E. Watkins in the case of *United States* v. *Lias*, 103 F. Supp. 341, 344, affd. 196 F. 2d 90, which was an action to foreclose liens for income taxes assessed and outstanding against the petitioner for the years 1942 to 1947, inclusive.

We have found as a fact that the bank accounts, certain real estate, and the stock from which the income in question arises, belonged to the petitioner.

We, therefore, hold that the respondent's determination that the income from such sources was taxable to the petitioner in the years received has not been shown to be erroneous.

Petitioner relies heavily upon an agreement dated November 1, 1948, purporting to be an accounting between petitioner, John Lias, Gregory Manos, and William Manos.

The agreement was prepared by petitioner's attorneys, based upon certain schedules compiled by Richard Overmeier, a certified public accountant in the employ of Frazer and Torbet, who were retained by the petitioner in connection with his pending income tax matters. Overmeier was given directions to ascertain how much money had been invested by petitioner in his enterprises on behalf of the parties to the agreement so that transfers of the securities could be made.

The respondent contends that the agreement is a sham and without substance here. We are in accord with that view. Overmeier testified that there were no records to show that the amounts listed on the schedules attached were left in the Lias enterprises and that he relied upon the oral statements of the petitioner and John Lias that all monies reported as income were left with the petitioner for investment. There are no personal books of the petitioner or the others to establish the interfamily financial relationships. The only available records were some check stubs and canceled checks. A number of the checks were not produced or available to determine the endorsements thereon. Neither John Lias nor William Manos testified in these proceedings. We have heretofore observed that the testimony of the petitioner is not credible. Gregory Manos testified that he was not interested in a strict accounting; that when he signed the agreement no schedules were attached and that he was not familiar with nor consulted regarding his interest.

We are of the opinion that the real purpose of the agreement of November 1, 1948, was an attempt by petitioner to establish ownership of the stocks listed therein to others, whereas the entire record convinces us that the petitioner was the actual owner thereof. The attempted transfers were without consideration and they are determined to be without validity against the respondent. We are not here concerned with its legal effect as between the individuals themselves. Attention is also directed to the able opinion of Judge Watkins in the case of *United States* v. *Lias, supra.*

We have discussed at some length the various contentions of petitioner to the effect that the net worth statement is arbitrary and unauthorized and find that they possess no substantial merit.

The petitioner makes no claim of having received any money or property by gift or inheritance. Nor has any claim been advanced that the visible assets listed on the net worth statement were not acquired in the taxable period involved.

On the basis of the net worth statement set forth in our Findings of Fact, which is supported by the entire record, we hold that the petitioner's unreported income for the taxable years in question is as follows:

| Year | Amount |
| --- | --- |
| 1942 | $42,611.92 |
| 1943 | 185,611.89 |
| 1944 | 334,269.61 |
| 1945 | 586,656.61 |
| 1946 | 50,040.79 |
| 1947 | 196,212.48 |

and that for the year 1948, in which year the petitioner and his wife, Alice B. Lias, filed a joint return, the unreported income was in the amount of $58,809.31.

We next consider the question of the propriety of the imposition of the 50 per cent addition to the tax for fraud. As to this issue the burden is upon the respondent.

The repeated understatement of income in each of the taxable years by percentages ranging from a minimum of 137 per cent in 1946 to a maximum of 488 per cent in 1944 establishes a prima facie case of fraud.

We, therefore, weigh the arguments advanced by the petitioner in support of his position that the fraud penalties are not justified. These may be briefly summarized as: (a) The respondent has pointed to no source of income other than those sources reported by the petitioner; (b) the only source of petitioner's income was from the Lias enterprises and the respondent has recognized the books and records of such enterprises as properly reflecting income, and that

the returns filed were in conformity therewith; and (c) the petitioner was prosecuted criminally for willfully and knowingly attempting to defeat and evade income taxes for the years 1942 to 1946, inclusive, and the jury found him not guilty.

We find no merit in the claim that the respondent has not shown any source of income that would account for the increase in the petitioner's net worth. In view of the very large discrepancy between the net income, as reported, and the cost of assets acquired, plus the nondeductible expenses, we think it was not incumbent upon the respondent to show any specific amounts of income omitted from petitioner's returns. *Kite* v. *Commissioner*, 217 F. 2d 585, affirming on this issue a Memorandum Opinion of this Court filed August 15, 1953. This record reveals likely sources of unreported income. By his own admission the petitioner was a gambler, and in the taxable year 1943 claimed a loss of approximately $20,000 from his individual gambling activities. Petitioner held substantial interests in partnerships and owned controlling interests in certain corporations whose only source of income was from gambling operations. Considerable evidence was presented by the respondent respecting the aggregate amount of $124,000 of mutilated money which was turned in by the petitioner and the Wheeling Downs Racing Association in September and November 1951. One package contained $15,000 in currency which the petitioner caused to be sent direct to the United States Treasurer for redemption. The petitioner testified that the $15,000 was money stolen in 1946 by an employee of the Market Street Club, was hidden in a cabinet file which went through a fire in Zeller's Steak House in April 1949, and was discovered in 1951 when the file cabinet was removed. Treasury officials examined the currency to determine how much was redeemable and recorded the serial numbers thereon. Their testimony is to the effect that the $15,000 was buried and not burned currency, that many of the serial numbers were consecutive, and their records disclosed that some of the currency had not been issued until 1947. This evidence discredits the petitioner's claim that it was part of the bank roll of the Market Street Club stolen by an employee in 1946, and that the currency was in the fire of 1949.

Also, in September 1951, three separate packages of mutilated currency, aggregating $109,000, were delivered by an employee of the Wheeling Downs Racing Association to the Half Dollar Bank for deposit or exchange. The petitioner claims that this mutilated currency was taken in at the parimutuel windows and was not in usable condition. Witnesses from the redemption divisions of the Government testified that some of the $109,000 was buried currency and had a bad odor. Many of the serial numbers which were listed by the

officials were consecutive, indicating a strong unlikelihood that such currency had been turned in by various bettors at the parimutuel windows. The mutilated monies referred to above are not reflected in the net worth statement. While we are unable to find from the record in what year the mutilated currency was earned, or its true ownership, the testimony is referred to as indicating a possible source of unreported income and as refuting petitioner's contentions.

Nor do we find any substance in the claim that the Lias enterprises kept proper books and records and that the respondent accepted the returns as conforming to such records with only minor adjustments. The record shows that certain underlying records were not available so as to enable the revenue agents to make an audit and for that reason the books and work papers were adopted as the best evidence. The respondent does not admit that such records establish the correct income of the Lias enterprises. Goldberg testified that witnesses Berklas, Kartsimas, and McGill, who were charged with making some of the primary records, were not qualified bookkeepers. Other individuals who kept primary records of some of the enterprises in which petitioner had an interest were not sworn as witnesses.

The record also shows that on its returns for 1942, 1943, and 1944, Automatic reported as its income the respective amounts of $35,000, $60,000, and $50,000, which petitioner took without any record having been made. These amounts were recorded on Automatic's books by Goldberg as year-end adjustments based on oral statements of the petitioner. If petitioner could take such amounts without records having been made, we can only surmise what other amounts he may have similarly taken. The petitioner's history of wanton disrespect for observance of the law and his conflicting testimony under oath do not commend credence in his oral statements.

Automatic owned and operated various coin machines, including slot machines. The number of slot machines operated during the period 1942 to 1944, inclusive, has not been definitely shown. Estimates of witnesses indicate the number was at times between 250 and 350. Automatic kept its depreciation records on a cost rather than on a unit basis. Since the slot machines which Automatic operated were subject to a Federal license fee and to a fine imposed by the City of Wheeling, West Virginia, where most of the slot machines were installed, it is not unlikely that Automatic preferred not to record the number of units it had in operation and for that reason adopted the cost basis. The net worth statement shows that the largest amounts of unreported income were in the taxable years 1944 and 1945.

The record discloses that, beginning in about December 1941, the governing authorities of the City of Wheeling adopted a policy of

noninterference with gambling activities and, instead, imposed fines quarterly on slot machines and various paraphernalia used in gambling operations. The Lias enterprises were the beneficiaries of not only the freedom to engage in gambling activities in the City of Wheeling but of the prosperity of the war years. Such favorable conditions could readily have produced greater revenue than that shown by the visible assets listed on the net worth statement. The expenditures of petitioner kept pace with the increased income. In November 1944 the city authorities changed their policy and prohibited the operation of slot machines, but continued collecting fines upon other gambling equipment used by the Lias enterprises. The record indicates that after such change in policy the petitioner's income and expenditures greatly declined. Since the Lias enterprises and the petitioner himself continuously handled very large amounts of cash the opportunity for concealment was great and, presumably, the temptation was the more impelling.[2]

The final contention of the petitioner that the jury found him not guilty of willful attempt to evade income taxes for the years 1942 to 1946, inclusive, which cover a part of the years before us, requires no extended discussion. In *Helvering* v. *Mitchell*, 303 U. S. 391, the Supreme Court held that an acquittal of a taxpayer on a charge of willful attempt to evade or defeat income tax was no bar to a collection of the 50 per cent addition to the tax for fraud.

For the year 1948 the petitioner and his wife, Alice B. Lias, filed a joint return which was prepared by Goldberg. The record furnishes no direct evidence that Alice B. Lias had knowledge or was involved in the Lias enterprises except as a stockholder in some of the corporations. It does not appear that the revenue agents contacted her in determining the net worth statement against the petitioner. Alice B. Lias was not a witness in these proceedings. Under the circumstances, we think, the respondent has not clearly established that Alice B. Lias filed a false and fraudulent return in 1948 with intent to evade tax. However, having filed a joint return she is jointly and severally liable for the deficiency and addition to the tax for fraud herein determined. *Howell* v. *Commissioner*, 175 F. 2d 240.

In our opinion, this record convincingly establishes that the petitioner filed false and fraudulent returns and that a part of the deficiency for each of the taxable years 1942 to 1948, inclusive, was due to fraud. We, therefore, hold that the respondent properly imposed the 50 per cent addition to the tax for fraud in each of the taxable years in question.

---

[2] This appears fully in the testimony adduced in *Automatic Cigarette Sales Corporation,* T. C. Memo. 1955–15, which, by stipulation, is part of the instant record.

The next question presented is whether the petitioner understated his tax in his declaration of estimated tax for each of the years 1943 to 1947, inclusive, by more than 20 per cent. The burden is upon the petitioner to show error in the respondent's determination. The petitioner, on brief, makes no argument with respect to this issue. If the petitioner has not abandoned the issue, we hold that he has failed to carry his burden of showing that the 6 per cent penalty provided by section 294 (d) (2) of the 1939 Code should not be added and, therefore, sustain the respondent on this issue.

The final question presented is whether the deficiencies for the years 1942, 1943, and 1944, are barred by the statute of limitations. The issue is of substance only where fraud is not established. Since we have determined that the petitioner is liable for the 50 per cent addition to the tax for fraud for each of the taxable years involved, this issue is mooted.

It may properly be noted that the transcript of the testimony covers approximately 7,150 pages, the exhibits are in excess of 400, and the briefs are 600 pages in length. The magnitude of the record indicates to some degree the Court's task in endeavoring to present its determination in a concise and lucid manner. A more detailed discussion of the evidence would, we think, tend to confuse rather than enlighten. Much of the evidence presented has no decisive bearing on the issues. The fact that all of the evidence has not been specifically discussed does not mean that its materiality and importance has not been fully considered and evaluated by the Court in arriving at its determination of the issues.

*Decisions will be entered under Rule 50.*