UNITED STATES of America, Appellee,

v.

Dolores LEBRON, Rafael Cancel Miranda, Irvin Flores Rodriguez, Andres Figueroa Cordero, Julio Pinto Gandia, Juan Francisco Ortiz Medina, Jose A. Otero Otero, Rosa Collazo, Juan Bernardo Lebron, Carmelo Alvarez Roman, Armando Diaz Matos and Manuel Rabago Torres, Appellants.

No. 241, Docket 23458.

United States Court of Appeals Second Circuit.

Argued March 17, 18, 1955.

Decided May 10, 1955.

532

Freedman & Unger, New York City (Abraham Unger, New York City, of counsel), for appellant Lebron.

Abraham M. Dubno, Brooklyn, N. Y., for appellant Jose A. Otero Otero.

Conrad J. Lynn, New York City, for other appellants.

J. Edward Lumbard, U. S. Atty., New York City (Milton R. Wessel, George S. Leisure, Jr., Julio E. Nunez and Thomas M. Debevoise, Asst. U. S. Attys., New York City, William S. Hundley, Sp. Asst. to the Atty. Gen., of counsel), for appellee.

Before CLARK, Chief Judge, FRANK, Circuit Judge, and GALSTON, District Judge.

FRANK, Circuit Judge.

1. The appellants urge, inter alia, that there was insufficient evidence to support the jury's finding of a conspiracy, that at most the evidence showed not one continuing conspiracy but multiple conspiracies improperly (and prejudicially) joined in the indictment, and that the prosecution failed to link each defendant with the alleged conspiracy.

Viewing the evidence, as we must, on appeal, most favorably to the government, the record shows that the Nationalist Party of Puerto Rico, once a political party, had abandoned hope of achieving Puerto Rican independence through legitimate political processes in favor of overthrowing American authority in that commonwealth by force of arms and by violence. A part of its activities was public, e. g., the circulation of pamphlets, newspapers and other propaganda urging the forcible liberation of Puerto Rico and resistance to American authority there. The bulk of the party's activities were clandestine. Groups in New York, Chicago and Puerto Rico, ostensibly operated as social clubs, were in reality "juntas," cells of the party network. The various "juntas" held secret meetings and maintained closed communication with each other by using codes and messengers of secret identity. Initiation of recruits into the "juntas" consisted of an esoteric ceremony led by party leaders in black robes. Recruits were trained in the use of rifles and pistols. Arms and ammunition were hoarded; crude bombs and Molotov cocktails were manufactured.

Periodically the party committed spectacular acts of violence. In October 1950, the party launched an unsuccessful revolution in Puerto Rico. There were simultaneous armed uprisings in two cities and against the Fortaleza, residence of the commonweath governor. At least nine lives were lost before the insurrection was quelled by native forces. Two days later, two party members attempted to assassinate Harry Truman, then President of the United States, at Blair House in Washington, D. C., where President Truman then resided. One of the President's guards and one would-be assassin were killed. The party then concentrated on a master plan for revolution in Puerto Rico encompassing occupation of military garrisons and attacks on American forces stationed on the Island. In March of 1954, four party members, all of them defendants in this case, journeyed to Washington and, from the gallery of the House of Representatives, fired upon the assembled Congressmen. Five Congressmen were wounded.

The Washington attack illustrates the close coordination of activity between juntas. The pistols used in the attack upon Congress were purchased by the Chicago junta, and delivered to the New York group. The New York group not only provided the four gunmen with their weapons but also provided the funds for their railroad tickets. Shortly before the attack, one of the defendants who had returned from Puerto Rico announced that "the master" (Pedro Albizu Campos, apparent leader of the party in Puerto Rico) wanted no communications, but rather that "the only news he wanted was what he read in the newspapers."

We think the above evidence sufficient to permit the jury to find a single continuous conspiracy operating at least from September 1950 to May 1954, the period covered by the indictment. We also think that the government has successfully linked each of the appellants with the conspiracy. Evidence from which the

jury might have so concluded is set forth in the footnote.[1]

■ 2. The appellants assert an abridgment of their right to counsel because of the attendance by Raymond Sorrell, a government informer, at a conference between Conrad J. Lynn, an attorney, and several party members. The grand jury had already handed down the indictment against the seventeen, and Mr. Lynn had been retained to represent at least one defendant. Sorrell had not yet been exposed as an informer, and party members presumably regarded him as a loyal party member.

It may be that where, after indictment, a government agent or government informer intrudes on any discussion whatever between a defendant and his lawyer, the intrusion is such a violation of defendant's constitutional right to counsel that the defendant is entitled to a new trial without any proof by him that the intrusion harmed defendant, even if the intrusion was prompted by the highest motives. Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879; Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749; Cf. United States v. Venuto, 3 Cir., 182 F.2d 519; Melanson v. O'Brien, 1 Cir., 191 F.2d 963. Where the intrusion is on a conference between defendant's lawyer and prospective witnesses, with the defendant absent, the result may well be the same—provided there is proof that the conference involved a discussion of the prospective witness' testimony at the trial.

But here such proof is lacking. Sorrell, the informer, testified that he attended a meeting of the New York Junta or Board of the Party on June 14, 1954,

1. (1) Rosa Collazo: Liaison between party leaders in Puerto Rico and the New York junta; treasurer of the New York junta and participant in its discussions.

(2) Andres Figueroa Cordero: one of the group which fired upon the House of Representatives; members of the New York junta and one of the participants in its initiation ceremony.

(3) Julio Pinta Gandia: president of the New York junta, 1949; appointed delegate for the Nationalist Party of Puerto Rico to the United States, 1950; gave orders to Chicago junta to obtain weapons for Congressional attack; administered oath of membership in party; urged forcible resistance to arrest by FBI.

(4) Dolores Lebron: one of the group which fired upon the House of Representatives; secretary of the New York junta, 1953; general delegate for the party to the United States replacing Gandia, 1954.

(5) Juan Bernardo Lebron: member of the New York junta; attended and participated in discussions of planned acts of violence; told witness Sorrell, a government informer posing as a party member, that he (Lebron) had a clip full of bullets in Washington (during the Congressional shooting) which he had thrown out of the car when he believed that the FBI was following him; told witness Sotomayor, then a member of the party, that the party might soon call on Sotomayor for a "patriotic act" (party euphemism for "act of violence")

and instructed Sotomayor in what to declare publicly should he survive the "patriotic act."

(6) Armando Diaz Matos: treasurer of the Chicago junta, 1952; one of triumvirate selected to direct Chicago operations after dissolution of the Chicago junta; procurer of arms; participant in pistol practice.

(7) Juan Francisco Ortiz Medina: president of New York junta, 1953; receiver of pistols from Chicago used for the attack upon Congress; home used as New York party headquarters.

(8) Rafael Cancel Miranda: one of group who fired upon Congress; attended New York junta meetings at which violence was discussed.

(9) Jose A. Otero Otero: attended New York junta meetings at which violence was discussed; vice-president of New York junta, 1953; editor and publisher of New York party newspaper; appointed Minister of Propaganda, 1954.

(10) Irvin Flores Rodriguez: one of group which fired upon Congress; elected officer of New York junta.

(11) Carmelo Alvarez Roman: officer of juntas in New York and Puerto Rico; his Puerto Rican farm used as training ground for weapons and for manufacture of bombs and Molotov cocktails.

(12) Manuel Rabago Torres: bodyguard to Pedro Albizu Campos, identified as the party's major leader; member of party organization in Puerto Rico and attended meetings of Chicago junta.

at which Mr. Lynn was present. But Sorrell had no recollection that at that meeting anything was said concerning the defense of the defendants. Ruth Reynolds a defense witness, testified as follows as to that meeting at which none of the defendants was present:

"Q. Were you present at an apartment at 660 Riverside Drive at the end of May or beginning of June of this year at which Sorrell was present? A. I was present at a meeting there, he was present on the evening of June 14.

"Q. Was I there also? A. You were present.

"Q. If you know, will you tell me what that meeting was concerned with and who was there? A. It was a meeting called for some of the Nationalists to discuss the case in Washington and this conspiracy charge, the trial, present trial deals with, to discuss with attorney Mr. Lynn plans in relation to the ending of the case that was being tried in Washington at that moment and with this conspiracy charge, and I was present there as—I was at that time employed by you as an investigator and I was present for that reason.

"You were present, Antonio Arrera was present; Lydia Collazo was present; Esteban Anna Marie Quinones was present; I think Lolita Torresola was there.

"Q. Is Miss Lydia Collazo the daughter of Rosa Collazo, the defendant in this action? A. Yes, sir.

"Q. That's all. In addition to the plans for defense, was the matter of funds for the defense also discussed at that meeting? A. Yes, the meeting was concerned with how funds were going to be raised for an adequate defense."

The foregoing in no way discloses that defense counsel and any prospective witness discussed what any of the witnesses would testify at the trial.

3. Several defendants urge that the trial judge erred in refusing to sever their indictments from the others and, more particularly, from the indictment of the four gunmen who fired upon the Congressmen. In part, the claim of error is based on possible prejudice resulting from the reaction of jurors to so peculiarly heinous a crime as that indiscriminate attack. In part, it is based on the theory that the Congressional attack constitutes a separate conspiracy in which the particular defendants urging this claim are not involved. As noted earlier, we reject the theory that that attack was a separate conspiracy, and we agree with the trial judge that evidence of that attack was admissible against all of the defendants. The grant of a severance is within the discretion of the trial judge, and, where the charge against all the defendants may be proved by the same evidence and results from the same series of acts, an upper court will not interfere with that discretion. United States v. Cohen, 2 Cir., 124 F.2d 164. We think the trial judge here did not "abuse" his discretion.

4. Surprise and prejudice are claimed in the judge's denial of motions for bills of particulars. The indictment, however, was sufficiently specific to apprise defendants of the nature of the charge against them and to permit them to prepare adequately for trial. The defendants in the various questions included in their bills of particulars were, in effect, making an effort to obtain from the government a statement of its evidence, including the names of the informants. However desirable might be the practice—current in certain continental jurisdictions and in England [2]— of compelling the prosecution to disclose

2. As to the English practice, see Kenney, Criminal Law (15th ed. 1942) 563 note 3; Whitman, The Administration of the Criminal Law, 5 Lectures on Legal Topics (1928) 421, 424–25, 427–28; Wigmore, Evidence (3d ed.) Sec. 1850.

its evidence to the accused in advance of trial, that practice is not required by Federal Rules of Criminal Procedure, rule 7(f), 18 U.S.C. United States v. Flynn, D.C.S.D.N.Y., 103 F.Supp. 925, 933.

5. Various appellants contend that their prosecution for criminal conspiracy violates the right of political expression protected by the First Amendment. The claim is particularly urged by defendant Jose A. Otero Otero, whose party role, in part, was that of editor and publisher rather than of gunman, and whose last party position, before his arrest, was that of Minister of Propaganda. We think such a contention has been rejected by the Supreme Court in United States v. Dennis, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

6. As part of the voir dire examination, the prosecution handed to each potential juror a list of organizations, and inquired whether the potential juror was a member of any of them. The Nationalist Party of Puerto Rico was included in this list. Appellants suggest that the list was actually the Attorney General's list of subversive organizations, and that the defendants were prejudiced by the jurors having learned, however indirectly, that the Attorney General regards the Puerto Rican Nationalist Party as subversive, and by whatever prejudice might result from the association of the Nationalist Party on a common list with the Communist Party and the various groups regarded as Communist "fronts" and satellites. The government suggests that the list was not identified as the Attorney General's list of subversive organizations, and, in any event, that defendants waived their claim by failing timely to object. Although we do not endorse the practice of handing mimeographed lists of subversive organizations to potential jurors, the supervision of the voir dire is within the discretion of the trial judge. United States v. Dennis, 2 Cir., 183 F.2d 201, 228, and we cannot say that he abused his discretion in this case. All the information the government sought was obtainable directly through questions to jurors as to their organizational affiliations, United States v. Kertess, 2 Cir., 139 F.2d 923, and short-cutting the process by using a mimeographed list is not so offensive as to justify reversal. We suggest, however, that this practice be not again employed.

7. Objection is raised to the introduction, over objection, of testimony by Francisco Cortes Ruiz, one of the defendants who had earlier pleaded guilty and was not testifying on the government's behalf, as to a remark made to him by Wilfredo Sanchez Morales, not a defendant. Judge Walsh instructed the jury that the evidence was introduced only to show that the statement was made, and not to demonstrate the truth of the statement. We think the single question and answer, which contained no new information, was too trivial to be prejudicial, even if it should not have been admitted.

8. Defendant Lebron requested, before trial, a continuance of several weeks because of possible prejudice resulting from alleged unfavorable publicity in the local press, including reports of unusual security precautions to surround the trial courtroom. Other defendants did not join in the request. Lebron did not present any of the newspaper articles upon which he based his request. Judge Walsh denied the request. We cannot say he "abused" his discretion in this respect.

9. Several defendants urge error in that the judge refused to permit them to inspect 27 written reports submitted to the FBI by Raymond Sorrell, who had been a secret FBI informant during the period in which he submitted the reports in question, and who testified extensively at the trial against the defendants. Judge Walsh, in the privacy of chambers, read each of the reports and determined that they contained no material (a) inconsistent with Sorrell's testimony, or (b) bearing on possible entrapment of defendants. On that basis he refused to permit defendants

to examine the reports. Had the reports contained material tending to impeach the witness' veracity, or to show entrapment, then defendants would have been entitled to access to them. United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337; United States v. Beekman, 2 Cir., 155 F.2d 580; United States v. Coplon, 2 Cir., 185 F.2d 629, 638–640, 28 A.L.R.2d 1041; United States v. Alper, 2 Cir., 156 F.2d 222, 226, but the judge found no such material. These reports were ordered sealed and, in that manner, were made part of the record for our scrutiny. We have read them and agree with Judge Walsh's evaluation of them.

The judgments of conviction are affirmed.

Frank, Circuit Judge, dissented.