**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas D. CLANCY, James F. Prindable and Donald Kastner, Defendants-Appellants.**

**No. 12815.**

United States Court of Appeals Seventh Circuit.

March 24, 1960.

Rehearing Denied April 14, 1960.

---

620

John F. O'Connell, Paul P. Waller, Jr.,
East St. Louis, Ill., O'Connell & Waller,

**622**

East St. Louis, Ill., of counsel, for appellant.

Clifford M. Raemer, U. S. Atty., East St. Louis, Ill., Robert D. McKnelly, Asst. U. S. Atty., Danville, Ill., for appellee.

Before HASTINGS, Chief Judge, SCHNACKENBERG, Circuit Judge, and STECKLER, District Judge.

STECKLER, District Judge.

Thomas D. Clancy and James F. Prindable, two of the named defendants, were convicted in the district court of making a false statement of a material fact to agents of the United States Treasury Department, Internal Revenue Service, in violation of 18 U.S.C. § 1001; of willfully attempting to evade a substantial amount of wagering excise taxes due and owing by virtue of Chapter 35, subchapter A of the Internal Revenue Code of 1954 (26 U.S.C. § 4401), in violation of 26 U.S.C. § 7201; and of conspiring to violate that subchapter, in violation of 18 U.S.C. § 371. Donald Kastner, the other defendant, was convicted on the latter two counts, but was found not guilty of the false statement count. Trial was by jury.

Defendants raise numerous points on appeal, all of which can be classified under the following broad headings:

1. The legality of the search and seizure of defendants' books and records.

2. Whether the district court erred in overruling defendants' motions to dismiss the indictment on the grounds that the grand and petit juries were illegally drawn and constituted.

3. Whether the court committed reversible error in refusing to ask certain questions on the *voir dire* examination of petit jurors.

4. Whether the court erred in admitting certain exhibits into evidence, and in admitting testimony as to statements

of individual defendants without cautionary instructions to the jury.

5. Whether the court erred in refusing to order the production of reports of federal agents for use by the defendants during cross-examination, pursuant to 18 U.S.C. § 3500.

6. Whether the court erred in refusing to order acquittal both before and after the verdict.

7. Whether the court erred in instructing the jury and in refusing to give certain instructions tendered by defendants.

8. Whether the court erred in refusing to grant a new trial after hearing evidence of possible misconduct on the part of a petit juror.

In order to resolve these issues, a somewhat detailed analysis of the record is essential.

There is evidence in the record that the defendants, Thomas D. Clancy, James F. Prindable and Donald Kastner, were partners in the North Sales Company, and as such were engaged in accepting wagers, principally on horse races, in East St. Louis, Illinois. The defendants, doing business as the North Sales Company, by Thomas Clancy, applied for and received the special tax stamp for the fiscal year ending June 30, 1957 as required by 26 U.S.C. § 4411. In the special tax return and application for registry-wagering, the business address of the company was designated "at Large—2401 Ridge Ave.—E. St. Louis, Ill." However, when the application was produced at the trial by a government witness, the words "at Large" had been penciled through.[1] The defendants filed monthly tax returns of wagers accepted by them and paid the tax reported to be due thereon to the District Director of Internal Revenue at Springfield, Illinois. Defendants received a letter from H. J.

---

1. The government witness, Joseph M. Heckelbech, Chief of the Collection Division of the District Director's Office, could not say when the words "at Large" had been stricken out. However, witness Waller, the defendants' bookkeeper, tes-
tified that the words "at Large" were not stricken out when he filed the application; that the application was not returned to him as being incorrect; and that the stamp had been issued pursuant to the application.

White, District Director, dated April 17, 1957, which informed them that a recent examination of their tax liability for the years January, 1955 through December, 1956, indicated that no change was necessary to the tax reported and that the returns would be accepted as filed.

The record indicates that during March, April, and early May of 1957, federal agents of the Internal Revenue Service observed activities which led them to believe that a gambling operation was being conducted on the premises located at 2300 and 2300A State Street, East St. Louis, Illinois. The first floor of the premises was occupied by a business known as "Zittel's Tavern," and the second floor, 2300A, was an apartment. According to the affidavit for search warrant, Agent Johnson placed wagers with "Heine" and "Murphy" at Zittel's Tavern, the latter being a bartender there, and observed Heine walk to a doorway behind the bar which leads upstairs over the men's toilet and place money envelopes in a stairwell area and close the door. Heine later picked up an envelope from behind the door which contained Agent Johnson's winning from a prior bet. Johnson also observed scratch sheets, racing forms, money and 4-inch by 6-inch paper pads on the bar, back bar, under the bar, on tables, in the stairwell and in the safe. Agent Mueller observed a man carrying a sack, similar to sacks furnished by banks to carry money, enter the tavern, speak to Murphy, the bartender, and go behind the bar and through a door which leads upstairs. Agent Yerly observed Charles J. Kastner, Jr., brother of the defendant Donald Kastner, and the defendant Prindable, both well known bookmakers, enter Zittel's Tavern at 7:09 and 7:17 a. m., respectively, on May 1, 1957. Agent Ryan entered the tavern shortly after Charles J. Kastner, Jr. on that morning and saw Prindable enter and go behind the bar and through a door that leads upstairs. Agent Buescher interviewed two well known bookmakers in Collins-

ville, Illinois, and was told by them that they picked up horse bets and ordinarily received telephone bets at Blaha's Tavern in Collinsville. Agent Busch examined a transcript of toll calls pertaining to Blaha's Tavern, using Illinois Bell Telephone records, and established that between August 11, 1956 and January 25, 1957, twenty-one (21) telephone calls were made between Blaha's Tavern and 2300A State Street, East St. Louis. The telephone at 2300A State Street was subscribed to by one John Leppy. Agent Yerly examined the application for the occupational tax stamp of Charles J. Kastner, Jr. and Prindable, which stated that their business address was 2401 Ridge Avenue.[2] Joseph M. Heckelbech, Chief of the Collection Division in the office of the District Director at Springfield, examined the records in his custody and determined that no gambling stamp had been issued to John Leppy, Henry D Zittel, or any other person at 2300A State Street; and that no wagering excise tax returns had been filed by anyone at that address.

Upon this evidence, Agent Johnson applied to the district court for two search warrants, one for the first floor, and the other for the second floor of the building at 2300 and 2300A State Street. (Here on appeal we are concerned only with the search of the second floor, 2300A.) The part the other agents performed in the investigation was set forth in their separate affidavits which were, by reference, made a part of Agent Johnson's affidavit for the search warrant for the second floor. In addition, Agent Edwards corroborated much of the statement of Agent Yerly. The affidavit of Agent Johnson for the search warrant for the second floor states, in part, that he is positive the premises

"* * * are being used in the conduct and carrying on of a 'Wagering Business,' * * * against the laws of the United States, that is to say, the offense of wilfully attempting to evade and defeat a tax im-

---

2. This address was actually the residence of defendant Clancy, which appeared after the "at Large" designation had been penciled out.

posed by the Internal Revenue Laws * * * and the payment thereof, to wit, the special tax of $50 a year to be paid by each person engaged in the business of accepting wagers * * *; and the offense of wilfully failing to prepare and file with the district Director * * * the Special Tax Return and Application for Registry-Wagering (Form 11–C) * * * in the name of the operator of said business, namely, one John Doe * * *."

The district court, satisfied that there was probable cause to believe that a wagering business was being conducted on the premises described in violation of the said laws of the United States, issued the search warrants requested on May 5, 1957. The second floor warrant was addressed to "any Special Agent of the Intelligence Division of the Internal Revenue Service of the United States of America," and authorized the seizure of:

"* * * divers records, to wit books, memoranda, tickets, pads, tablets and papers recording the receipt of money from and the money paid out in connection with the operation of a wagering business on said premises, such files, desks, tables and receptacles for the storing of the books, memoranda, tickets, pads, tablets and papers aforesaid, and divers receptacles in the nature of envelopes in which there is kept money won by patrons * * * and divers other tools, instruments, apparatus, United States currency and records * * *."

On May 6, 1957, Agent Kienzler, accompanied by several other agents, executed the second floor search warrant and seized defendants' notes, books and records, currency in excess of $2,160, racing forms, scratch sheets, telephone bills, a check book, and several metal boxes. Defendant Donald Kastner was present in the apartment when the search was made and informed the agents that he, Clancy, and Prindable were partners in the North Sales Company and that the partnership had a tax stamp, which Clancy took care of. Agent Kienzler testified that he did not personally determine at that time whether the North Sales Company actually had a tax stamp, but obeyed the command of the warrant in searching and seizing the items described. Apparently no arrests were made at the time of the raid.

Subsequently, information obtained from the seized records was presented to a grand jury which, on July 25, 1957, returned a five-count indictment against the defendants. The first three counts charged Clancy, Kastner and Prindable severally with making false statements to agents of the Internal Revenue Service in violation of 18 U.S.C. § 1001.[3] Count IV charged each defendant with an attempt to evade a substantial amount of wagering excise tax during the fiscal year ending June 30, 1957. In support of this count specific unlawful acts were alleged.[4] Count V was the conspiracy count and

---

**3.** In Count I, Clancy was charged with making a false statement to Agents Mochel and Buescher on December 13, 1956, when he stated that the North Sales Company had no employees or agents accepting bets other than Charles J. Kastner, Jr. and Malcolm Wagstaff. In Count II, Kastner was charged with making a false statement to Agent Kienzler on May 6, 1957, the day of the raid, by stating that he did not know the names of individuals accepting wagers as agents of the North Sales Company. In Count III, Prindable was charged with making a false statement to Agents Mochel and Buescher on December 14, 1956, when he stated that he did not

know any other horse bookies except himself, Clancy and Donald Kastner.

**4.** In substance it was alleged:
  1. During March, 1957, defendants reported wagers of $11,913.50, but actually received wagers in the amount of $103,441.30.
  2. Defendants kept false books and concealed the identity of agents.
  3. Defendants concealed and withheld records, sources of income, and lists of agents.
  4. Defendants maintained secret places of doing business.
  5. All three defendants made false statements to government agents.

alleged substantially the same acts as Count IV.

The defendants pleaded not guilty on July 30, 1957, and on August 14th following, filed a joint motion to dismiss the indictment and a motion for return of property and to suppress evidence. As far as relevant here, the motion to dismiss was based upon an allegation that the members of the grand jury were not "selected, drawn or summoned according to law." The motion to suppress attacked the affidavit of Agent Johnson as based on hearsay; the warrant's description of the articles to be seized as too general; the existence of probable cause; and the seizure of allegedly private books and papers. Defendants also filed a motion to inspect the transcript of evidence and record of the foreman of the grand jury.

In an entry dated July 25, 1958, the district court denied all three of the above motions. The court held, *inter alia,* that the charges in respect to the grand jury were mere "naked allegations"; that probable cause did exist; and that the items seized were specifically described in the warrant and were not private books or papers, but rather "property used in the commission of crime."

On May 8, 1959, defendants filed an amended motion to dismiss with an affidavit of the jury commissioner, Bohlen J. Carter, attached. In the affidavit the jury commissioner states that names of prospective jurors were solicited from various persons, including school superintendents. When the juries were drawn, he and the clerk, Douglas H. Reed, separately took a handful of cards from the box and sorted them according to the distance they lived from the place at which the grand and petit juries were to function, namely East St. Louis, Danville, Cairo, or Benton, Illinois. Only those thought to live within a reasonable distance would be selected.[5] The other names would be placed back in the box. Carter also stated that he did not know how many names were in the box, but estimated about 200 or possibly 400 to 500. Defendants complained that the grand jury was not selected according to law, 28 U.S.C. § 1864, and that it was not selected by chance, but by "whim and caprice."

The court denied the amended motion to dismiss on the grounds that the grand jury had been properly drawn; that even if there were irregularity, defendants had failed to show prejudice or the violation of any constitutional rights; and that the motion was filed too late according to local rules.

During the course of the trial, the court admitted the search warrant and return (Government Exhibit 29a) and the various records and articles seized in the raid (Government Exhibits 54 through 112) into evidence. Defendants objected on the basis of an illegal search and also on the ground that relevancy and materiality had not been shown. Agent Kienzler merely stated that these were the articles seized in the raid. Later, however, the chain of custody of the exhibits was established and Agent Mochel testified that he had used Exhibits 54 through 79 to determine that the total amount of bets actually placed with defendants in March, 1957, was $103,441.-30.

Defendants also objected to the admission into evidence generally of statements allegedly made by them individually to government agents. Defendants claim that such statements were admissible only as against the one making them, since a conspiracy had not yet been established, and, as to the statements of defendant Kastner, that any conspiracy, if it had existed, was terminated when the statements were made.

Agents Buescher and Mochel testified that they interviewed Clancy on Decem-

5. In the affidavit Mr. Carter mentioned 50 to 60 miles as a "reasonable distance." In subsequent testimony in another proceeding, made a part of this record by an offer of proof by defendants, Mr. Carter corrected this statement by stating that the distance was actually 100 to 125 miles. Mr. Reed testified in this extraneous proceeding that the distance was approximately 150 miles.

ber 13, 1956 in the office of Press Waller. They testified that during the interview Clancy identified the other defendants as partners in the North Sales Company; stated that they had no particular place of business; and that they had only two agents. The agents also testified that Clancy stated that they did not use the telephone, but went from place to place accepting wagers. The statement made by Clancy during this interview with respect to not having any employees or agents, other than Charles J. Kastner, Jr. and Malcolm H. Wagstaff, was the basis of Count I of the indictment.

Agents Buescher and Mochel also testified that they had an interview on December 14, 1956, with Prindable in Waller's office, in the presence of Donald Kastner. In the interview, according to the testimony, Prindable stated that he paid off bettors in person and that he never "laid off" any bets. In answer to a question asking whether he could recommend another bookie to take a bet larger than he could handle, Prindable stated that he did not know of any other horse bookies except himself, Clancy and Donald Kastner. The latter statement was the basis of Count III of the indictment.

Agents Kienzler and Minton were permitted to testify to the substance of a conversation between Kienzler and the defendant Kastner at the time of the raid. According to the testimony, Kastner stated that he was a junior partner and clerk of the North Sales Company, answered the telephone and took bets. He worked on a commission basis. Kastner named the other two defendants as partners and stated that Clancy took care of the records and had the tax stamp. This interview was the basis of Count II of the indictment.

Supervisor Hudak and Agent Mueller testified to the substance of a second interview with Kastner in the offices of the United States Attorney in the Federal Building in East St. Louis, on July 23, 1957, two and one-half months after the raid. According to their testimony, Kastner in this interview admitted taking bets by telephone at 2300A State Street and also at the residence of one Vernon Lampe. He explained in detail the manner in which bets were recorded and the business conducted. Kastner also named various "agents" who accepted bets for the North Sales Company, including Merlin Behnen, a tavern keeper, and Otto Pohlman; and described the arrangements had with the "agents," i. e., forty or fifty per cent bets, in which the "agents" received forty or fifty per cent of the profit and shared forty or fifty per cent of the loss, or five per cent bets, in which the agents received five per cent of the gross amount of bets placed.

After Agent Buescher had testified to the interviews with Clancy and Prindable, the defendants on cross-examination established that Buescher had prepared, signed and submitted to his superior, Mochel, a written report pertaining to the substance of the interviews. The report was composed after Buescher had returned to his office. Buescher did not take longhand notes at the time of the interviews, but in preparing the report agreed with and used contemporaneous longhand notes taken by Agent Mochel. During the testimony of Agent Minton it was brought out that he made a similar report to his superiors, under like circumstances, following the conversation between Kienzler and Donald Kastner at the time of the raid on May 6, 1957.

Defendants demanded production of these reports for use during cross-examination under the provisions of the so-called "Jencks Act." 18 U.S.C. § 3500. The district court denied the requests on the ground that the reports were not made contemporaneously with the interviews, but subsequent thereto. However, the court did require the Government to turn over to the defendants for inspection after direct examination, the longhand notes taken at the time of the interviews by the agents. Thus, defendants received the notes taken by Agent Mochel during the interviews with Clancy and Prindable in December, 1956, and the notes taken by Supervisor Hudak and Agent

Mueller during the interview with Kastner in the Federal Building on July 23, 1957. Defendants made no request for any notes taken by Agent Kienzler during the May 6, 1957 conversation with Kastner.

The defense called no witnesses, but attempted to develop a theory of defense by cross-examination of government witnesses and argument of counsel. As to the false statement count against Clancy, the defense theory apparently was that the individual bet takers, other than Charles J. Kastner, Jr. and Malcolm Wagstaff, were "independent contractors," rather than "agents." The statement of Prindable, that he did not know any other horse bookies, according to defense counsel, was not false when considered in context. The agents had asked him if he could recommend any other book to take a bet larger than he could handle. His reply, under the circumstances, it is asserted, meant that he did not know any other horse book that would take bets larger than he. The principal theory as to Counts IV and V was apparently that the excess of bets, not reported, represented "lay-off" bets from other bookies. The defendants allegedly did not know that they were required to report these bets as part of the gross bets received. Defendants also argue that all of the evidence as to willfulness applied only to Clancy, who actually had charge of the books and records.

The trial court overruled defendants' motions for acquittal and submitted the case to the jury. The defendants tendered certain instructions, which the court refused to give, and to this, the defendants complain that the court failed to properly instruct the jury on their theory of the case. Defendants also objected to certain of the court's instructions as not supported by the evidence, as being misleading and confusing to the jury, and as not containing all the elements of the crimes charged.

Subsequently, defendants filed motions for acquittal notwithstanding the verdict and for a new trial. One of the grounds urged in support of the latter motion was that a petit juror who served in the case had stated privately to another prospective juror that he was prejudiced against anyone who accepted wagers; but on voir dire stated that he was not so prejudiced. In support of this allegation, defendants called one Mrs. Vera Simmons, an original member of the jury panel, who testified that a male juror sitting next to her stated privately that he felt the same as she did, after Mrs. Simmons acknowledged prejudice against gamblers to the court and was excused for cause. Mrs. Simmons could not remember the juror's name, on which side of her he sat, or whether he had actually served on the petit jury. One of defendants' counsel, Paul P. Waller, Jr., asked permission to testify as to the seating arrangement of the jury panel, and offered to prove that the male jurors sitting on both sides of Mrs. Simmons did in fact serve on the petit jury, and that one of them, Clinton Beinfohr, served as the foreman of the jury. The court denied permission to testify, unless Mr. Waller would withdraw from the case. Mr. Waller refused to withdraw, and his testimony was not heard.

The court denied the motions for judgment of acquittal notwithstanding the verdict and for a new trial. In regard to the misconduct of juror issue, the court stated that the testimony of Mrs. Simmons absolutely failed to substantiate the allegations of misconduct on the part of a juror who actually served. Further, the court stated that the defendants' counsel had reported the matter to the court in a conversational manner in chambers during the trial. The court at that time advised counsel that there was nothing before it on which to act. However, the defendants made no motion or request of any kind, but waited until after the verdicts of guilty had been returned before pursuing the matter fully. Under the circumstances, the district court concluded, defendants "failed to challenge the alleged prejudice of the juror in apt time."

The defendants' first major argument concerns the denial of the motion to sup-

press. In support of their argument, defendants attack the basis upon which the warrant was issued, the form of the warrant itself, and the nature of the articles seized pursuant thereto.

It seems paramount that we first determine whether there was probable cause to believe a crime was being committed at the premises to which the affidavits and search warrants were directed. Defendants say there was no probable cause and that the affidavits were invalid because based upon hearsay.

██ In determining whether probable cause exists for the issuance of a search warrant it need not be determined whether the offense charged has actually been committed; the only concern being whether the affiant has reasonable grounds, at the time of the making of the affidavit and the issuance of the warrant, for believing the law was being violated on the premises to be searched. Dumbra v. United States, 1925, 268 U.S. 435, 441, 45 S.Ct. 546, 69 L.Ed. 1032; Carney v. United States, 9 Cir., 1947, 163 F.2d 784, 786, certiorari denied, 332 U.S. 824, 68 S.Ct. 165, 92 L.Ed. 400. Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief by a man of reasonable caution that a crime is being committed. Brinegar v. United States, 1949, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879; Dumbra v. United States, supra.

██ It appears from the argument made by the defendants that they would have this court consider only their status as licensed gamblers, and disregard the knowledge the agents had in respect to the activities taking place at the State Street address. They assume the warrant was issued for the express purpose

of seizing their books and records, for they argue that since they had registered, received a wagering stamp, and paid some wagering taxes, there was no probable cause for seizure of their books. But, as pointed out by the Government, what defendants overlook by such argument is the fact that the warrant was not issued for the purpose of seizing *their* books. The warrant was directed to certain premises and ordered the seizure of property described therein. It did not order the seizure of defendants' property because it was not known at the time who was operating the wagering business at the address stated in the warrant. From the agents' observations there was probable cause to believe that a wagering activity was being operated in violation of the laws of the United States, especially since the premises had not been reported to the District Director as required by 26 U.S.C. § 4412.[6] See Merritt v. United States, 6 Cir., 1957, 249 F.2d 19.

The defendants' argument that the search warrant for the second floor of the building was invalid because issued upon affidavits based upon hearsay, is likewise without merit. A cursory examination of the affidavits upon which the warrant was issued, without regard to hearsay, and based only on the knowledge of the affiants from personal observations, clearly takes this case out of the ambit of the cases relied on by the defendants, i. e., Sparks v. United States, 6 Cir., 1937, 90 F.2d 61; Crank v. United States, 8 Cir., 1932, 61 F.2d 981; Simmons v. United States, 8 Cir., 1927, 18 F.2d 85; United States v. Clark, D.C.D.Mont.1927, 18 F.2d 442; and United States v. Lassoff, D.C. E.D.Ky.1957, 147 F.Supp. 944.

██ As to the form of the search warrants, defendants state that they were void in that they were not directed

6. "§ 4412. Registration
"(a) Requirement.—Each person required to pay a special tax under this subchapter shall register with the official in charge of the internal revenue district—
"(1) his name and place of residence;

"(2) if he is liable for tax under subchapter A, each place of business where the activity which makes him so liable is carried on, and the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf; * * * *".

to any particularly named person, but rather to a class; that the property to be seized was not capable of accurate determination, inasmuch as the words, "letters, tickets, papers, records and books," is not a sufficient description; that exploratory searches may not be made to look for evidence with or without a search warrant, and that an invalid search is not made lawful by what it brings to light.

By the terms of 18 U.S.C. § 3105, it is provided:

"A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."

Although it would be a better practice to direct the search warrant to a particular officer by name, the statute does not require it. So long as the warrant is directed to civil officers of the United States authorized to enforce or assist in enforcing any law thereof, or otherwise authorized to serve such warrant, even though they are not specifically named, but identified, it is sufficient. Rule 41(c), F.R.Cr.P., 18 U.S.C., Gandreau v. United States, 1 Cir., 1924, 300 F. 21, 25; see United States v. Smith, D.C.S.D.Fla.1927, 16 F.2d 788, 789; United States v. Nestori, D.C.N.D.Cal.1925, 10 F.2d 570, 571; Boehm v. United States, 7 Cir., 1924, 6 F.2d 497, 498; United States v. Tolomeo, D.C.W.D.Pa.1943, 52 F.Supp. 737, 738.

■ That the articles to be seized by virtue of the search warrant were described with sufficient particularity, can hardly be questioned in view of the authorities. Nuckols v. United States, 1938, 69 App.D.C. 120, 99 F.2d 353, 355, certiorari denied, Floratos v. United States, 305 U.S. 626, 59 S.Ct. 89, 83 L.Ed. 401; Merritt v. United States, 6 Cir., 1957, 249 F.2d 19; see also, Clay v. United States, 5 Cir., 1957, 246 F.2d 298, certiorari denied, 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed.2d 69.

In the Nuckols case, supra, a search warrant was held sufficient which commanded the seizure of "* * * gaming tables, gambling devices, race horse slips, and gambling paraphernalia * * *." The court said, 99 F.2d at page 355:

"In the search of a gambling establishment the same descriptive particularity is not necessary as in the case of stolen goods."

And in Merritt v. United States, supra, 249 F.2d at page 20, the court approved affidavits for a search warrant, and the search warrant, where the affidavits described only "* * * lottery tickets and other paraphernalia 'which will indicate a numbers operation is being conducted on the premises.'"

As to the contention that the search was exploratory, in view of the evidence, and what we have heretofore set forth, we cannot agree that the search was merely exploratory.

■ The remaining point raised with respect to the motion to suppress is that the search and seizure was unreasonable and in contravention of defendants' rights under the Fourth and Fifth Amendments to the Constitution, for the reason that *private* books, records, papers and documents are not subject to seizure, even under authority of a search warrant. This protection, they contend, extends to partnership books and papers. Defendants make the point that the property seized, constituted, "at most, evidence and did not constitute the instrumentalities for the commission of a crime against the United States."

The basis of their argument is that they had filed an application for registry-wagering and had, in fact, obtained a wagering stamp for the period in question; had filed monthly reports and paid the full amount of the tax reported. Consequently, it is argued that the books and records were not "instrumentalities" of a crime against the United States, and therefore could not be seized except in contravention of their constitutional rights. Stated in another way, it is in-

sisted that in so far as the federal laws were concerned, defendants were engaged in a legitimate enterprise, and, for that reason, the books, papers and records used in connection therewith were not contraband, but private papers, protected against seizure under the Fourth and Fifth Amendments. Defendants rely heavily upon Takahashi v. United States, 9 Cir., 1944, 143 F.2d 118. In that case the defendants were charged with conspiracy, with violation of an executive order by designating China as the country of destination on an application for license to export certain new storage tanks when in fact Japan was the country of ultimate destination, and with causing false and fraudulent statements to be made in the application in a matter within the jurisdiction of the Department of State. Custom officers seized the documents in question, including code telegrams, letters, and other papers, indicating the true destination of the tanks was Japan. The court of appeals held that a motion to suppress should have been sustained and overruled the contention that the papers were more than mere evidence but were themselves the instrumentalities of a crime. The court in substance said that although the application for the license itself would be an instrumentality for the commission of a crime, the tanks themselves and papers taken from the defendants were mere evidence of *an intention* on the part of the defendants to commit a crime under both of the substantive counts in the indictment. In other words, evidence of crime or *malum in futuro*. Specifically the court said, at page 124:

> "The distinction must be drawn between papers which are a part of the outfit or equipment actually used to commit an offense such as the ledgers and bills used to maintain a nuisance exemplified by the situation developed in Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231, and those papers which are simply evidences of intent, design or even of the agreement of the defendants."

Thus, the Takahashi case recognizes the rule that ledgers, bills and other types of books and records, may be the instrumentalities of a crime. We hold that gambling paraphernalia, such as that used by the defendants, when used in commission of a crime in violation of 26 U.S.C. § 7201, *i. e.*, knowingly attempting to defeat and evade the wagering tax, becomes "a part of the outfit or equipment actually used to commit an offense," as mentioned in Takahashi, supra. See Merritt v. United States, supra; Foley v. United States, 5 Cir., 1933, 64 F.2d 1, certiorari denied 289 U.S. 762, 53 S.Ct. 796, 77 L.Ed. 1505; Landau v. United States Attorney, 2 Cir., 1936, 82 F.2d 285.

Furthermore, there is good authority for holding that the books, records and papers seized in the case at bar were not such *private* papers as to be clothed with immunity from seizure and use against the defendants under the Fourth and Fifth Amendments. Under 26 U.S.C. §§ 4403, 4423, 6001, and United States Treasury Regulation 132 § 325.32, the defendants were required to keep books and records reflecting transactions carried on in the course of a taxable wagering activity. Such records were to be kept on a day-to-day basis and were required to be made available for inspection by Internal Revenue officers at all times. In the case of Boyd v. United States, 1886, 116 U.S. 616, at pages 623–624, 6 S.Ct. 524, 528, 29 L.Ed. 746, a case relied on by the defendants, the court stated:

> "The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government * * *. As this act was passed by the same congress which proposed for adoption the original amendments to the constitution, it is clear that the

members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment. So, also, the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures."

This exception to the privilege against self-incrimination and searches and seizures, has come to be known as the "required records exception," and has been recognized in numerous cases. Shapiro v. United States, 1948, 335 U.S. 1, 17–20, 32–33, 68 S.Ct. 1375, 92 L.Ed. 1787; Davis v. United States, 1946, 328 U.S. 582, 589–590, 66 S.Ct. 1256, 90 L. Ed. 1453; Wilson v. United States, 1911, 221 U.S. 361, 380, 31 S.Ct. 538, 55 L. Ed. 771; Smith v. United States, 8 Cir., 1956, 236 F.2d 260, 268, certiorari denied 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed. 2d 118, rehearing denied 353 U.S. 989, 77 S.Ct. 1280, 1 L.Ed.2d 1147; Beard v. United States, 4 Cir., 1955, 222 F.2d 84, 92–94, certiorari denied, 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753, rehearing denied, 350 U.S. 904, 76 S.Ct. 175, 100 L.Ed. 794. See also, Meltzer, Required Records, The McCarran Act, and the Privilege Against Self-Incrimination, 18 U. of Chi.L.Rev. 687 (1951).

In Shapiro, supra, 335 U.S. at page 33, 68 S.Ct. at page 1392, the court stated:

" * * * the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established.' "

In view of what has here been said, we conclude that the trial court committed no error in denying the defendants' motion to suppress.

█ We next take up the jury selection issue. We note that the original motion to dismiss did not specify any grounds and was not supported by competent evidence. Further, the amended motion to dismiss, at most, complained of mere irregularities and was filed too late according to the local rules of the district court.[7]

It is significant to note that the local rule is substantially the same as former Section 556a of Title 18 U.S.C. That statute was discussed in Wright v. United States, 8 Cir., 1948, 165 F.2d 405, 407. The court held that the right to challenge the grand jury panel was waived as the challenge was not seasonably presented in accordance with the ten-day limitation. In the recent case of Scales v. United States, 4 Cir., 1958, 260 F.2d 21, reversed on other grounds, 355 U.S. 1, 78 S.Ct. 9, 2 L.Ed.2d 19, the court of appeals affirmed the district court's decision in refusing to entertain a motion challenging the grand jury. The decision was based upon Rule 12 of the Federal Rules of Criminal Procedure, inasmuch as the lower court had no rule comparable to Rule 27 of the lower court in this case. There the court noted, as in the instant case, the information upon which the motion was based was at all times available to the defendant. In that case the defendant was less than one

7. Rule 27, Rules of the United States District Court for the Eastern District of Illinois, provides:

"(1) A plea in abatement to an indictment directed against the legality of the grand jury returning said indictment shall not be entertained by the court unless the same shall have been filed within 10 days from the date of the return of the indictment; provided, however, that in the

event the defendant has not been apprehended at the time the indictment is found such plea shall be filed within 10 days after his apprehension, unless he or his counsel shall sooner have been apprised of his indictment, in which case the plea shall be filed within 10 days after he or his counsel shall have been apprised of his indictment."

year delinquent in making his motion, whereas here the defendants delayed almost twice that long. Most significant to us, however, is the defendants' failure to show any prejudice or the violation of any constitutional rights, either with respect to the grand jury, or the petit jury.

▪ The defendants' motion to strike the array because of the alleged improper choosing and selection of the petit jury was filed after the jury had been selected. In their argument, defendants cite Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 and Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. Those cases involved a systematic exclusion from the jury panel because of a particular sex or group. Nothing of the kind is involved in this case. In short, we find nothing wrong with the manner in which the prospective jurors' names were obtained. See Local 36 of International Fishermen and Allied Workers of America v. United States, 9 Cir., 1949, 177 F.2d 320, 341; Scales v. United States, supra. Nor do we find material irregularity in the drawing of the names of those prospective jurors who were summoned for petit jury duty. United States v. Gottfried, 2 Cir., 1948, 165 F.2d 360, 364, certiorari denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139, rehearing denied, 333 U.S. 883, 68 S.Ct. 910, 92 L.Ed. 1157; United States v. Skidmore, 7 Cir., 1941, 123 F.2d 604, 607.

▪ Turning next to the alleged error in the court's conduct of the voir dire examination, it is well settled that such examination is within the discretion of the trial judge, and the exercise of such discretion will not be disturbed on appeal in the absence of a clear showing of abuse. United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, 536, certiorari denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774; Speak v. United States, 10 Cir., 1947, 161 F.2d 562, 563. The two tendered questions asked by the court [8] were designed to uncover prejudice against gamblers and religious scruples against gambling. The other questions tendered were merely cumulative and argumentative.[9] As to this issue we find no abuse of judicial discretion.

▪ The trial court likewise has broad discretion in the order of admitting evidence at the trial. United States v. Bender, 7 Cir., 1955, 218 F.2d 869, 873, certiorari denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253. Here the articles seized in the raid were relevant in the attempt to prove that the defendants were engaged in a wagering business and not paying the full amount of the required excise tax, a fact which the Government had to prove to secure a conviction on Counts IV and V of the indictment. Some of the exhibits were later used by Agent Mochel in support of his testimony that defendants received gross wagers in the amount of $103,441.30, in March, 1957.

▪ The admission of the agents' testimony without cautionary limitation concerning the substance of the four interviews with the defendants was not, in our view, reversible error. Evidence of admissions of co-conspirators may be presented prior to the conclusive establishment of the conspiracy without commission of error so long as the conspiracy is established at some time during the course of the trial. United States v. Sansone, 2 Cir., 1956, 231 F.2d 887, 893,

8. "2. Do you teach Sunday School?
 "7. Would you be prejudiced against anyone who accepts wagers?"

9. "1. Do you believe that gambling itself is immoral, per se, or morally wrong?
 "3. To what denomination, if any, do you so teach? * * *
 "4. We also ask the Court to ask the jurors if they can give these defendants a fair trial even though the evidence

shows that the laws, gambling laws, of the State of Illinois were violated. * *
 "5. Can you separate the violation of the law with which they are charged in the indictment, that is, the laws of the United States separate and apart from the violation of state laws?
 "6. Do you have a prejudice against people engaged in the business of operating horse books?"

certiorari denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500. Since the jury could conclude from all the evidence that a conspiracy had been conclusively established, there was no error in the admission of the evidence on that ground. It is likewise clear that the conspiracy, if any, had not terminated in December, 1956, the time of the interviews with Clancy and Prindable, and on March 7, 1957, the time of the first interview with Kastner. The second interview with Kastner, on July 23, 1957, presents a more difficult question. Although no arrests had been made up to that time, the defendants' gambling operation had been raided, and their books and records seized, some two and one-half months prior thereto. However, defendants were not subsequently charged with operating an illegal gambling business, but with attempting to evade a substantial amount of wagering excise tax. The district court could reasonably find that a conspiracy to violate 26 U.S.C. § 7201 had not terminated at the time of the July 23d interview. The usual criterion for determining the conclusion of a conspiracy is the arrest of the co-conspirators. Sandez v. United States, 9 Cir., 1956, 239 F.2d 239, 243; Cleaver v. United States, 10 Cir., 1956, 238 F.2d 766, 769. Cf. Scarborough v. United States, 5 Cir., 1956, 232 F.2d 412. Moreover, even if the declarations of one co-conspirator are erroneously received as evidence against another co-conspirator, there is no reversible error if, as here, there is other competent evidence sufficient to prove the facts sought to be established by such declarations. Massicot v. United States, 5 Cir., 1958, 254 F.2d 58, 64; Papadakis v. United States, 9 Cir., 1953, 208 F.2d 945, 953.

The next contested issue is whether the trial court erred in refusing to order the Government to produce the memoranda or reports of the government agents pursuant to the "Jencks" Act, 18 U.S.C. § 3500.[10] Defendants rely on the decision in Bergman v. United States, 6 Cir., 1958, 253 F.2d 933.

Since the "Jencks" Act was the direct outgrowth of the decision in Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, the statute must be read and interpreted in the light of that decision. Palermo v. United States, 1959, 360 U.S. 343, 345, 79 S.Ct. 1217, 3 L.Ed.2d 1287. "The Act's major concern is with limiting and regulating defense access to government papers, and it is designed to deny such access to those statements which do not satisfy the requirements of (e), or do not relate to the subject matter of the witness' testimony. It would indeed defeat this design to hold that the defense may see statements in order to argue whether it should be allowed to see them." Palermo v. United States, supra, 360 U. S. at page 354, 79 S.Ct. at page 1226.

10. The pertinent parts of the statute read:

"§ 3500. Demands for production of statements and reports of witnesses

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. * * *

* * * * *

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

■ We think there is a distinction between the type of case here at hand and those cases in which the Government produces as a witness an undercover agent whose dealings with the accused are the subject of the agent's testimony at the trial. Here the defendants were aware of the identity of the government agents at the time they made the statements which later furnished the basis of the prosecution against them. They were not dealing with undercover agents whose true identity they did not know. Cf. Jencks v. United States, supra; Bradford v. United States, 9 Cir., 1959, 271 F.2d 58; United States v. Prince, 3 Cir., 1959, 264 F.2d 850.

The final decision as to production must rest within the good sense and experience of the district judge guided by the standards as outlined by the Supreme Court,[11] and subject to the appropriately limited review of the appellate courts.

■ It is significant to note, that at the request of defendants' counsel the court required the Government to turn over to the defense, for use in cross-examination, the longhand notes taken at the time of the interviews. In view of this, we are unwilling to agree that there was an abuse of judicial discretion on the part of the trial judge in not ordering the production of the memoranda prepared by the witnesses after the interviews had been completed, particularly since parts of the memoranda were based upon the notes and interpretations of other agents. We hold that such reports and memoranda are not statements within the meaning of the statute. Accordingly, the defendants were not entitled to their production for use in the trial. Palermo v. United States, supra; Johnson v. United States, 10 Cir., 1959, 269 F.2d 72; Borges v. United States, 1959, 106 U.S.App.D.C. 139, 270 F.2d 332; Papworth v. United States, 5 Cir., 1958, 256 F.2d 125, certiorari denied, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88,

rehearing denied, 358 U.S. 914, 79 S.Ct. 239, 3 L.Ed. 235.

■ Next, defendants complain that the trial court committed reversible error in refusing to direct an acquittal, or in the alternative to grant a new trial. In support of this allegation, defendants argue that the Government failed to prove that the tax allegedly due was in fact not paid by the various government witnesses who testified that they had received bets ultimately covered by the defendants. This argument is based upon defendants' contention that the various tavernkeepers who accepted bets were not "agents" of the North Sales Company, but rather independent bookies who were themselves liable for the 10 per cent excise tax on wagers accepted by them, notwithstanding the fact that they laid-off a portion of the bets to defendants. Treasury Regulation 325.24(b).

The record shows that on cross-examination by defendants' counsel, the tavernkeepers testified that the defendants exercised no control over them as to which bets to accept or reject. However, the record also shows that all but one testified that they were directly engaged by one of the defendants to receive wagers, and received their commissions on a monthly basis. They also testified that upon receiving wagers they reported them to the North Sales Company by telephone. A messenger delivered form sheets and scratch sheets to them and either picked up the money received as wagers, or left money for the payment of winners. It appears that all records of wagers and computations of winnings and losses were made by defendants. Agent Mochel testified that his examination of defendants' books and records did not reveal any attempt to differentiate between regular bets and lay-off bets. Likewise, defendants did not report that they had accepted any lay-off wagers on their wagering tax returns for July, 1956, through April, 1957, although they

---

11. The Supreme Court has said that the statute does not provide that inconsistency between the statement and the witness' testimony is to be a relevant

consideration, nor that the statement be admissible as evidence. Palermo v. United States, supra, 360 U.S. at page 353, 79 S.Ct. at page 1225, note 10.

were required to report the "[g]ross amount of lay-off wagers accepted during month."

Under these circumstances, the jury could have found that the tavern-keepers were not independent bookies, themselves liable for the tax, but rather that they were accepting bets for the defendants. See United States v. Calamaro, 1957, 354 U.S. 351, 356, 77 S.Ct. 1138, 1 L.Ed.2d 1394. Furthermore, we find no statutory language which would require the Government to prove that the tax allegedly due from the defendants was not paid by someone else. See 26 U.S.C. §§ 4401, 6419(b) and 7201.

The defendants also contend that the Government failed to prove "wilfulness," "knowledge," or "intent" with respect to Counts I, III, IV and V of the indictment. Here again, defendants rely on the "independent bookie" theory, and that the amount of bets not reported constituted layoff bets, which defendants in good faith thought they did not have to report. As heretofore stated, these were questions for the jury.[12] "The specific willful intent and bad motive required for conviction * * * is, of course, inherently unsusceptible of direct proof." Lloyd v. United States, 5 Cir., 1955, 226 F.2d 9, 14.

Defendants' alternative argument, that any proof of willfulness applies only to Clancy, must likewise fail. Although it appears from the record that Clancy alone signed the tax returns and had charge of the books and records, it was also established that Prindable and Kastner were partners in the enterprise with a proprietary interest. The jury could reasonably find from all the evidence that the latter two also had the requisite intent. This case is not like the situation in Ingram v. United States, 1959, 360 U.S. 672, 79 S.Ct. 1314, 3 L. Ed.2d 1503, relied upon by defendants, where the court reversed the convictions of two relatively minor clerical func-tionaries at the headquarters of the operation.

Further, defendants contend as to Count V, that there was no evidence produced by the Government of an *agreement* to commit an offense against the United States. However, evidence of an express agreement is unnecessary. As this court stated in United States v. Gordon, 7 Cir., 1943, 138 F.2d 174, at page 176:

"[A conspiracy] is seldom capable of proof by direct testimony and may be inferred from the things actually done. It is enough if the minds of the parties meet and unite in an understanding way with the single design to accomplish a common purpose, which may be established by circumstantial evidence or by deduction from facts from which the natural inference arises that the overt acts were in furtherance of a common design, intent and purpose. * * * If the parties act together to accomplish something unlawful, a conspiracy is shown."

Here, the jury, considering all the evidence, could reasonably find that an unlawful conspiracy did exist. There is no reason for this court to upset the jury's finding. See Pereira v. United States, 1954, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435.

Defendants also argue that the trial court committed reversible error in failing to give certain instructions to the jury which they tendered, and in wrongfully instructing the jury as to the law of the case. We have examined the court's instructions and find them as a whole to be correct in law and fair to the defendants. The materiality of the false statements in Counts I and III of the indictment is a question for the court and not the jury. United States v. Alu, 2 Cir., 1957, 246 F.2d 29, 32; United States v. Parker, 7 Cir., 1957, 244 F.2d 943, 950, certiorari denied, 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48.

12. The evidence that defendants did not segregate lay-off bets in their own books or tax returns could be considered by the jury as showing willfulness or intent.

■ True, defendants were entitled to instructions on their theory of the case for which there was any foundation in the evidence, even though they did not present any testimony. United States v. Indian Trailer Corporation, 7 Cir., 1955, 226 F.2d 595, 598; United States v. Phillips, 7 Cir., 1954, 217 F.2d 435, 441. However, they were not entitled to instructions "resting upon mere speculative assertions manufactured wholly from thin air." United States v. Achilli, 7 Cir., 1956, 234 F.2d 797, 808, certiorari denied, 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122, vacated 352 U.S. 1023, 77 S.Ct. 588, 1 L.Ed.2d 595, affirmed 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed. 2d 918, rehearing denied 354 U.S. 943, 77 S.Ct. 1391, 1 L.Ed.2d 1540.

■ A review of defendants' tendered instructions relied upon on appeal reveals that they are either partially incorrect in law (Instruction VIII), covered in substance by the court's instructions (Instruction XIX), not supported by the evidence (Instruction III), or abstract and irrelevant (Instruction IX). The court committed no reversible error in refusing to give such tendered instructions.

Finally, as respects the defendants' last major argument concerning alleged misconduct on the part of a juror, and the court's refusal to allow one of the attorneys for the defendants to testify regarding the same unless he withdrew from the case, we find no merit.

■■ The disposition of a motion for new trial rests within the sound discretion of the trial judge, and his ruling on the motion is subject to. review only for an abuse of judicial discretion. United States v. Empire Packing Co., 7 Cir., 1949, 174 F.2d 16, 20. Moreover, the integrity of the jury may not be assailed by mere suspicion and surmise, but it is presumed that the jury are true to their oath and conscientiously observe the instructions of the court. United States v. Sorcey, 7 Cir., 1945, 151 F.2d 899, 903.

■ Although an attorney is competent to testify. in his client's behalf, the court is then justified in excluding him from further participation in the trial. Christensen v. United States, 7 Cir., 1937, 90 F.2d 152, 155. Here, the attorney refused to withdraw from the case; and we hold that under such circumstances, it was not an abuse of discretion for the court to refuse to hear his testimony.

■ The testimony of Mrs. Simmons was plainly insufficient to support defendants' allegations that a juror *who actually served* on the petit jury had answered falsely on *voir dire* examination and was prejudiced against gamblers.

■ Also, it is clear from the trial court's memorandum that defendants waived the objections to the qualifications of the petit juror which they press here. If a party obtains knowledge during the progress of a trial of misconduct on the part of a juror, he must object at once, or as soon as the opportunity is presented, or be considered as having waived his objection. See 89 C.J.S. Trial § 483. Merely calling the matter to the attention of the court without any objection thereto is insufficient; and it is not incumbent upon the court to take action with respect thereto on its own volition. 89 C.J.S. Trial § 484. The defendants knew of this matter during trial, but did not pursue it fully or make a motion of any kind. Under these circumstances, defendants waived any objection arising therefrom.

For the reasons herein set forth, we affirm the judgment of the district court.

Affirmed.

SCHNACKENBERG, Circuit Judge. (concurring).

The failure of the trial judge to require the production by the government of the memoranda prepared by certain government witnesses presents a difficult question on this appeal. However, I am not convinced that Judge Steckler's holding on that subject is wrong.

The language in the cases which he cites lends considerable support to his conclusion.